BOARD OF COUNTY COMMISSIONERS OF CECIL
COUNTY, ET AL. *v.* ELWOOD RACINE

[No. 303, September Term, 1974.]

*Decided February 13, 1975.*

436

The cause was argued before THOMPSON, POWERS and MENCHINE, JJ.

*Edwin B. Fockler, III,* for appellant Board of County Commissioners of Cecil County, with whom was *Daniel H. Bathon* on the brief, for other appellants.

*Harry J. Goodrick* for appellee.

MENCHINE, J., delivered the opinion of the Court.

Elwood Racine, (Racine) was the owner of a mobile home subdivision, known as Mansion Heights, in Cecil County, Maryland. The subdivision consisted of 7 lots of about one half acre each as shown on a duly approved plat, recorded among the plat records of the Circuit Court for Cecil County in March, 1967, in Plat Book W.A.S. No. 2, folio 77. The seven lots were laid out on the north and south sides of Mansion Drive. Mansion Drive entered the development from Route 272. The tract was within the "Highway Commercial Zone C-2." On July 26, 1973 Racine filed an application for a zoning and sanitary permit with the zoning department for the use of lot 2 in the mobile home subdivision for a mobile home without a permanent foundation. The zoning officer denied it. Racine's appeal to the Cecil County Board of Appeals (Board) also resulted in a denial of the requested permit. Racine's appeal to the Circuit Court produced reversal of the Board's decision. An appeal to this Court by the Board of County Commissioners of Cecil County and by other aggrieved persons followed.

For reasons hereafter stated, we conclude that use of lot 2 of Mansion Heights for a mobile home without a permanent foundation in a mobile home subdivision is an authorized

use of land within the C-2 zoning. We find this conclusion not dispositive of the litigation however, because of the contention by appellants that a doctrine akin to *res judicata*, arising from an earlier, identical decision by the Board in prior litigation, bars Racine's requested use.

## The Interpretation of the Ordinance

The Cecil County zoning ordinance essentially is of the cumulative type, with quite limited exceptions. Otherwise stated, such uses as were authorized in residential zone R-3 generally continued to be authorized uses in local commercial zone C-1 and such uses as were authorized in the latter generally continued to be authorized uses in highway commercial zone C-2. The pertinent portions of zone R-3, zone C-1 and zone C-2 (together with the pertinent limiting exceptions applying in C-1 and C-2 zones) read as follows:

"Subsection 3. *Residential Zone R-3 (High-Density)*

This zone is residential in character, but permits the wide variety of dwelling types suitable to urban living.

a. The following uses are permitted:

1) all uses permitted in Residential Zone R-2 (Medium-Density);
2) multiple dwellings;
3) apartment hotels;
4) fraternity or sorority houses;
5) boarding houses and rooming houses;
6) mobile home subdivisions;
   * * * "

"Subsection 7. *Local Commercial Zone C-1*

This zone is meant to provide for the daily shopping and business needs of nearby residences, and contains those retail, service, and office uses which serve primarily the local population.

a. The following uses are permitted:

1) all uses permitted in the Residential Zone R-3 (High Density) but not special exceptions permitted therein;

\* \* \*."

"Subsection 8. *Highway Commercial Zone C-2*

This zone contains uses catering to highway travelers and also uses which serve the shopping and business needs of the local and regional population.

a. The following uses are permitted:

1) all uses permitted in Local Commercial Zone C-1, except dwellings;

\* \* \*." 1

To recapitulate, mobile home subdivisions are specifically authorized in the R-3 zone; continue to be authorized by blanket authorization in zone C-1; and continue to be authorized by blanket authorization in zone C-2, unless such use is prohibited by the limiting words in Section 5, subsection 8 a (1), *supra.*

Section 18 of the Cecil County zoning ordinance provides the following pertinent definitions:

*"Dwelling, One-Family* — A detached residence on a permanent foundation designed for or occupied by one family only.

*Dwelling, Two-Family* — A residence on a permanent foundation designed for or occupied by two families only, with separate housekeeping and cooking facilities for each.

*Dwelling, Multiple-Family* — A residence on a permanent foundation designed for or occupied by three or more families, with separate housekeeping and cooking facilities for each.[2]

---

1. It will be noted that mobile home subdivisions are specifically authorized in the R-3 zone and are not in express terms excluded in C-1 and C-2 zones.

2. It will be noted that each of those three dwelling definitions includes the words "a residence on a permanent foundation."

*Dwelling Unit* — A group of rooms located within a building and forming a single habitable unit with facilities which are used or intended to be used for living, sleeping, cooking and eating purposes.[3]

*Mobile Home* — A movable or portable residence at least 34 feet in liveable length built on a chassis connected to utilities and designed without a permanent foundation for year-round living.[4]

*Mobile Home Camp* — Any plot of ground which two or more mobile homes may be placed temporarily for not more than six (6) months of any year.

*Mobile Home Park* — Any plot of ground of at least four (4) acres upon which a minimum of five mobile home spaces are located.

*Mobile Home Subdivision* — A mobile home park, except that lots and streets must conform to subdivision regulations for single-family dwellings."

The Board of Appeals had denied Racine's application. In doing so it had in substance adopted the interpretation of the ordinance as expressed in a decision by a predecessor board on December 6, 1967 upon an identical application by Racine for permits as to other lots in the same subdivision. That board in rejecting the earlier application had said, *inter alia*:

"In perusing sub-section 8 a (1) which permits, as aforesaid, 'All uses permitted in local commercial zone C-1, except dwellings', the Board notes that in Local Commercial Zone C-1 all uses are permitted in the Residential Zone R-3 (high density) but not special exceptions permitted therein. Residential Zone R-3, permits, as a matter of right, certain uses among which are mobile home subdivisions.

---

3. It will be noted that this definition includes the words "within a building."

4. It will be noted that this definition avoids use of the word "dwelling" and includes the words "without a permanent foundation."

"Fundamentally, in the final analysis, the Board feels that the legislative intent rather than any technical niceties written into the Ordinance should govern the interpretation of the section in question. Thus in view of the very plain and obvious purposes for which the Highway Commercial Zone C-2 is designed, it does not appear to the Board that it will be consistent with these purposes to permit the location of a permanant residential development therein, be the same 'dwellings', or 'residences', or 'mobile homes'.

"That the Board has the authority to interpret the Ordinance is amply supported by the Provisions of Section 9, Paragraph 1 when read in conjunction with the provisions of Section 8, Paragraph 2. It is therefore the opinion of the Board that the decision of the Zoning Inspector granting the permits to locate the mobile homes as aforesaid be reversed and the applicant be required to remove said mobile homes within thirty (30) days of this Opinion."

The sections referred to in the last quoted paragraph of the Board's 1967 decision read as follows:

"SECTION 8. BOARD OF APPEALS: PROCEDURE

\* \* \*

2. *Hearings; Appeals; Notice* — Appeals to the Board of Appeals concerning interpretation or administration of this ordinance may be taken by any person aggrieved or by any officer or bureau of the governing body of the county affected by any decision of the zoning inspector. Such appeals shall be taken within a reasonable time of such decision, not to exceed 10 days, by filing with the zoning inspector and with the Board of Appeals a notice of appeal specifying the grounds thereof. The zoning inspector shall forthwith transmit to the Board all papers constituting the record upon which the action appealed from was taken.

"The Board of Appeals shall fix a reasonable time for the hearing of appeals, give public notice thereto as well as due notice to the parties in interest, and hold the public hearing within forty-five (45) days from the date of the decision of the Zoning Inspector. At least fifteen (15) days notice of the time and place of such hearing shall be published in a paper of general circulation in the County. At the hearing any party may appear in person or by agent or attorney. The Board shall then decide the appeal within fifteen (15) days from the time of hearing."

"SECTION 9. THE BOARD OF APPEALS: POWERS AND DUTIES

The Board of Appeals shall have the following powers and duties:

1. *Administrative Review.* — To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by the zoning inspector in the enforcement of this ordinance."

In reversing the Board, the Circuit Court for Cecil County in the course of its written opinion said:

"While both a mobile home and a dwelling may be resided in and used as a residence, the distinguishing feature between them is the permanency by which they are attached to the land; if it has a permanent foundation, it is a dwelling; if not, it is a mobile home. Dwellings, that is, structures with permanent foundations, are not permitted in a C-2 Zone; mobile homes, so called because they are without a permanent foundation and are readily moveable, are permitted in such a zone. Once a mobile home is placed on a permanent foundation, it would lose its character as a mobile

home and become a dwelling as defined in the Zoning Ordinance. Therefore, mobile homes are permitted in a C-2 Zone."

We agree that a mobile home in a mobile home subdivision is an authorized use in a C-2 zone. The language of the ordinance, *supra*, is not susceptible of an interpretation that it was intended to exclude mobile home subdivisions from within the C-2 zone. To conclude that there was a legislative intent to prohibit *all residential uses* in the C-2 zone would require complete rejection as meaningless verbiage of the cumulative phrases authorizing "all uses permitted in the Residential Zone R-3" (High Density) (appearing in the C-1 section of the Ordinance) and "all uses permitted in Local Commercial Zone C-1" (appearing in the C-2 section of the ordinance).

An analogous suggestion was rejected by the Court of Appeals of Maryland in *Clarke v. County Commissioners*, 270 Md. 343, 311 A. 2d 417, wherein it was said at 348 [420]:

"Although Article 6 includes several principal permitted and conditional uses which one would normally expect to find in the agricultural zone, the legislative intent to *limit* the district to agricultural uses cannot be found in the body of that Article. As we peruse the permitted and conditional uses, we observe a number of them, apart from subsection (d), that negate any intent to restrict the zone to agricultural pursuits such as farming." (Footnote omitted.)

We find nothing in Sections 8 or 9 that would prevent application to this ordinance of the legal principle that:

"In the absence of a specific provision to the contrary in the zoning ordinance, the law generally is that zoning districts having less restricted uses permit the uses of the more restricted use districts."
*Martin and Burch v. Annapolis*, 248 Md. 551, 560, 237 A. 2d 728, 732-33.

Without hesitancy we declare that the December 9, 1967 decision of the Board was the product of an erroneous interpretation and application of the zoning ordinance and thus was arbitrary and capricious in a legal sense. An appeal to the Circuit Court from that 1967 decision had been dismissed as not timely taken. Thus there never has been a *judicial* determination of the issue before us.

Although it is plain that the Board in its present decision in substance adopted the earlier and, we think, erroneous interpretation of its predecessor, it chose also to rely upon a doctrine akin to that of *res judicata* to buttress its decision. The Board's decision in the subject case had declared, *inter alia*:

"On the 6th Day of December, 1967, this Board filed an opinion denying the similar request by the Applicant on the grounds that permanent residential development could not be construed as being permitted within the Highway Commercial C-2 Zone. The evidence submitted by the Applicant at the present hearing has shown no change of condition or circumstances which would justify the Board in altering its initial opinion.

"This holding of the Board is further reinforced by the decision of the Maryland Court of Appeals in Whittle vs. Board of Zoning Appeals, 211 Md. 36, which held that the Board may reconsider a previous decision only if a change in circumstances is clearly indicated. For the Board to alter its opinion on the evidence provided would, under the Doctrine of Whittle, be clearly arbitruary [sic] and caprecious [sic]."

We shall, accordingly, address ourselves to the question whether the order of December 6, 1967 is entitled to such finality between the parties as to cause Racine's present claim of right to be barred.

### The Effect of the 1967 Decision

Appellants urge that the 1967 decision of the Board

operates to bar Racine's right in subsequent litigation to contest it.

In the subject case it is uncontroverted that the issue presented is identical; the parties are identical. The sole question for our decision is the issue whether final decision by the Cecil County Board of Appeals on December 6, 1967 prevents subsequent litigation upon the identical subject by Racine under a doctrine akin to *res judicata.*

We have pointed out that an appeal from that decision had been dismissed as not timely filed. Thus there was no decision by a *court* upon the merits of the controversy. At one point in time, such a circumstance would have prevented application of the doctrine of *res judicata.* In *Knox v. Baltimore,* 180 Md. 88, 23 A. 2d 15, it was firmly stated at 93 [17]:

> "The Board of Zoning Appeals not being *a court of competent jurisdiction or judicial tribunal,* it cannot be held that the resolution passed by that Board on February 28, 1939, was *res judicata* as to whether appellant had a non-conforming use in the lot in question."

Continued viability of *Knox, supra,* was left in doubt by *Whittle v. Board of Zoning Appeals,* 211 Md. 36, 125 A. 2d 41, the case relied upon by the Board as controlling its 1973 decision. *Whittle* is not, of course, a precise authority for the reason that the earlier decision of the Board of Zoning Appeals in that case had been affirmed on appeal by the Circuit Court for Baltimore County. This circumstance was stressed in *Whittle* when it was said at 45 [46]:

> "In the instant case we have, of course, a prior court determination and the question of *res judicata* is directly involved."

*Whittle* did, however, declare at 45 [46]:

> "The general rule, where the question has arisen, seems to be that after the lapse of such time as may be specified by the ordinance, a zoning appeals

board may consider and act upon a new application for a special permit previously denied, but that it may properly grant such a permit only if there has been a substantial change in conditions. This rule seems to rest not strictly on the doctrine of *res judicata*, but upon the proposition that it would be arbitrary for the board to arrive at opposite conclusions on substantially the same state of facts and the same law." (Interior citations omitted.)

In the later case of *Woodlawn Ass'n. v. Board,* 241 Md. 187, 216 A. 2d 149, it was said at 193 [153]:

"In light of the administrative procedures and adjudications which the District Council is required to follow and make in the process of rezoning, the principles of public policy which underlie the rule of res judicata logically would seem to be applicable to its actions in this respect. See 2 Davis, *Administrative Law Treatise,* Ch. 18 (1958); 2 Cooper, *State Administrative Law,* Ch. XV, §§ 1 and 4 (1965); 2 Am. Jur. 2d *Administrative Law* §§ 496-97 (1962); Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L. Rev. 1, 20 (1964); *Hollywood Circle v. Department of Alcoholic Bev. Con.* (Cal., In Bank), 361 P. 2d 712, 714; *Evans v. Monaghan* (N. Y.), 118 N.E.2d 452, 458 ('Any general relaxation of the rule of *res judicata* is inadmissible even in strictly administrative matters')."

In the course of his opinion in *Woodlawn, supra,* Hammond, J. (later C. J.) said at 194 [154]:

"Professor Davis, *op. cit. supra,* Ch. 18 (§§ 18.02, 18.03 and 18.08 in particular), finds it completely clear on principle that '* * * the reasons behind the doctrine of res judicata as developed in the court system are fully applicable to *some* administrative proceedings' and that 'the courts generally follow this sound view * * *' He finds *Dal Maso* to have

446

been based on a clear misunderstanding that an agency can never perform a function sufficiently judicial for the principles of res judicata to become applicable. Although he finds the result in *Dal Maso* to have been right on the theory there had been a change in conditions, Professor Davis says of the case in Sec. 18.08 of Volume 2 of his work on Administrative Law at pp. 601-02:

'Worst of all is what the Maryland court has done — to lump together all agencies, to say that they are "arms and instrumentalities of the Legislature and are not judicial at all," and to conclude that therefore administrative action can never be res judicata. The unfortunate results of this type of thinking are rather clearly brought out in the Maryland zoning cases. * * * Happily, however, the Maryland court has seemingly retreated from its extreme position, for it has specifically acknowledged that "innumerable controversies are decided today, by boards of legislative creation, of a character that traditionally fell within the scope of judicial inquiry." ' (citing *Hecht v. Crook*, 184 Md. 271, 277.)" [5]

**5.** In its turn, the decision in *Woodlawn, supra,* was criticized by Professor Davis in Davis, Admin. Law Supp. § 18.12 (p. 623) as follows:

"The Maryland court is interesting in its movement from the unsound extreme that 'administrative action can never be res judicata' to the opposite unsound extreme that once a zoning agency has chosen a policy it can never change it as long as the facts are unchanged."

Professor Davis prior to that criticism on the same page had stated his position as to application of the principles of *res judicata* to administrative determinations as follows:

"The unsound idea that res judicata does not apply to administrative determinations is gradually being replaced by the sound idea that res judicata properly applies to some administrative determinations and that degrees of relaxation of res judicata are often appropriate. The Supreme Court's explicit rejection of the notion that res judicata is inapplicable to agencies is helpful. United States v. Utah Construction & Mining Co., 384 U. S. 394, 421-22, 86 S. Ct. 1545, 1559-60, 16 L.Ed.2d 642 (1966)."

It is quite plain, accordingly, that *at least some of the principles* of the doctrine of *res judicata* are applicable to decisions by zoning boards. The fundamental principles of that doctrine are well established. An early Maryland definition of the doctrine appears in *McKinzie v. B. & O. R.R. Co.*, 28 Md. 161, wherein it is said at 174-75:

> "A judgment, to operate as an estoppel, must be upon the same subject matter and between the same parties. The term 'parties,' however, is not restricted to those who appear as plaintiff and defendant upon the record. It includes those who are directly interested in the subject matter of the suit, knew of its pendency, and had the right to control, and direct, or defend it. The law, in dispensing even-handed justice to all, has wisely taken care *'ut sit finis litium*; and if matters, which have been once solemnly decided, could be again drawn into controversy, there would be no end of litigation and disputes. Mr. Greenleaf has happily said, 'justice requires that every cause be once fairly and impartially tried; but the public tranquility demands, that having been once so tried, all litigation of that question and between the same parties should be closed forever.' " (Interior citations omitted.)

A later Maryland definition appears in *Pat Perusse Realty v. Lingo*, 249 Md. 33, 238 A. 2d 100, wherein Hammond, C. J. speaking for the Court of Appeals, said at 35 [102]:

> "The basic rule of res judicata is that facts or questions which were in issue in a previous action and were therein determined by a court which had jurisdiction of the parties and the subject matter are conclusively settled by a final judgment in the first case and may not again be litigated in a subsequent action between the same parties or their privies even though the subsequent suit takes a different form or is based on a different cause of action."

There is substantial authority that the doctrine of *res judicata* itself should not be rigidly applied where the prior judgment or decree was the product of error of law. In 46 Am.Jur.2d, Judgments, § 416, it is said:

"There are cases stating that the doctrine precluding the relitigation of issues previously adjudicated in an action on a different cause of action, is confined to issues of fact or, at least, to mixed questions of fact or law, and thereby excluding questions of law from the operation of the doctrine. Under this rule, the doctrine does not extend to erroneous propositions of law applied by the court in reaching its decision."

An analogous rule is announced in Restatement of the Law of Judgments, § 70, at 318, where it is said:

"Where a question of law essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result."

In comment f of the above quoted Restatement rule it is said at 324:

"*Where injustice would result.* The determination of a question of law by a judgment in an action is not conclusive between the parties in a subsequent action on a different cause of action, even though both causes of action arose out of the same subject matter or transaction, *if it would be unjust to one of the parties or to third persons to apply one rule of law in subsequent actions between the same parties and to apply a different rule of law between other persons.*" (Italics supplied.)

Maryland, however, appears to have rejected any distinction between determinations of questions of fact and errors of law in the application of the doctrine of *res judicata* to judgments of courts of competent jurisdiction. The comprehensive force and effect of *res judicata* in Maryland is thus stated in *DeMaio v. Lumbermens Mutual Casualty Co.*, 247 Md. 30, 34, 230 A. 2d 279, 281:

"If there is an identity of parties, an identity of subject matter, jurisdiction over both and a final decision on the merits, there arises the classic situation for the application of the doctrine of res judicata. *Restatement, Judgments* Ch. 3, Introductory Note at pp. 158-59, and § 48; *Seaboard Terminals Corporation v. American Oil Co.*, 169 Md. 369; *Horowitz v. Horowitz*, 175 Md. 16; *Sterling v. Local 438, Liberty Ass'n of Steam and Power Pipe Fitters and Helpers' Ass'n*, 207 Md. 132. The doctrine as stated above applies without regard to the kind of court which rendered the earlier final judgment. It has been applied to a final determination of the Circuit Court, *Whittle v. Board of Zoning Appeals of Baltimore County*, 211 Md. 36, the Orphans' Court, *Shultz v. Houck*, 29 Md. 24, and the People's Court, *Vane v. C. Hoffberger Co.*, 196 Md. 450; and without regard to the form of the earlier action, *Christopher v. Sisk*, 133 Md. 48. A final judgment on the merits in favor of the garnishee in an attachment proceeding is conclusive as between the plaintiff and the garnishee in a subsequent action as far as the issue decided in the garnishment proceeding is concerned. 6 Am. Jur. 2d, *Attachment and Garnishment* § 393; 2 Shinn, *Attachment and Garnishment*, § 726; *Henderson v. Hall* (Ala.), 32 So. 840; *Roman v. Montgomery Iron Works* (Ala.), 47 So. 136; *Regan v. First Nat. Bank of Arizona* (Ariz.), 101 P. 2d 214; *Johnson v. Stockham*, 89 Md. 368, 376.

"In the case before us every test is met. The

parties were the same, the issue was the same, the courts had jurisdiction of parties and subject matter and the judgment of the City Court was on the merits and final.

> "If, as here, the court rendering the earlier judgment had jurisdiction of the parties and the subject matter, the fact that its final judgment was erroneous or irregular will not prevent that judgment from acting as a bar to a relitigation of the cause of action which was merged in the judgment." (Italics supplied.)

Should such an inflexible rule of law be made applicable to errors of law by administrative bodies? We think not.

We recognize, as indeed we must, that an unreversed final decision by a zoning board, passed in the exercise of its discretion upon issues of fact or upon mixed issues of law and fact are fully binding upon the parties to the cause and their privies as to all issues determined thereby. It is only when there has been a substantial change of conditions or it is shown that the decision was the product of fraud, surprise, *mistake*, or inadvertence, that such an administrative body may reverse its prior decision in litigation between the same parties. *Whittle v. Board of Appeals, supra; Woodlawn Ass'n. v. Board, supra; Gaywood Association v. MTA*, 246 Md. 93, 227 A. 2d 735.

The Court of Appeals indicated in *Gaywood, supra,* however, that the legal doctrine giving binding effect to decisions by zoning boards *should not be fully equated with the doctrine of res judicata,* saying at 100 [738-39]:

> "The protestants rely on *Woodlawn Area Citizens Association v. Board of County Commissioners of Prince George's County,* 241 Md. 187, 216 A. 2d 149 (1966), to support their contention that *res judicata* applies to debar the MTA from changing the former PSC finding of facts. In so doing, however, the protestants seem to have overlooked the fact that it

was the decision of a court and not an administrative agency that found the principles of *res judicata* controlling in that case. This alone distinguishes that case from this one. The point is well established. See *M. & C. C. of Baltimore v. Linthicum*, 170 Md. 245, 183 Atl. 531 (1936); *Bensel v. M. & C. C. of Baltimore*, 203 Md. 506, 101 A. 2d 826 (1954); *Chatham Corporation v. Beltram*, 243 Md. 138, 220 A. 2d 589 (1966); *Alvey v. Hedin*, 243 Md. 334, 221 A. 2d 62 (1966). While the action of an administrative agency reversing itself or a predecessor agency may resemble *res judicata*, it is *not*, as the cases show, the same as the final decision of a proceeding on its merits by a court of competent jurisdiction."

In the subject case we are called upon to determine whether the rule giving binding effect as between the parties, to a final decision of a zoning board extends to a decision by such a body that *solely* is the product of an error of law.

A comprehensive discussion of a relaxation of the doctrine as applied to administrative bodies will be found in Davis, Administrative Law, § 18.03 (1958), where it is said at 566:

"The desire for repose on which res judicata rests relates primarily to findings of fact; repose on lively problems of law may even be affirmatively objectionable. A tribunal ought not to be barred from using trial-and-error methods of feeling its way into an undeveloped frontier of law and policy. Even when the principle of res judicata should be rigidly applied to findings of fact, some relaxation of its application to rulings of law may be indicated. Many factors may argue against conclusive effect of an administrative decision of a question of law — the function may be somewhat non-judicial, law, and policy may be in state of flux, substantive reasons may require that the agency's authority to

> protect the public interest should remain unfettered, the administrative procedure may not have been geared to a careful consideration of the question of law, the agency may have been poorly staffed for deciding the question, or the legislative intent may have been that the agency's decisions of law should not be binding."

We conclude that where, as in the subject case, a condition is created whereby property similarly situated but owned by others, could be used for purposes that would be denied a prior litigant, the principle of *res judicata* should not apply to an erroneous determination of law by an administrative body. Any other course would approach, if it did not reach, a deprivation of constitutional dimension. In any event, unrelaxed application of the doctrine would constitute a manifest unfairness to Racine.

We are guided to our conclusion by the language used in a very recent decision of the Court of Appeals of Maryland, *Criminal Injuries Compensation Board v. Joseph D. Gould,* 273 Md. 486, 331 A. 2d 55 (1975), wherein it was said at 521 [76]:

> "Mistaken interpretation of law, however honestly arrived at, are held not to be within the exercise of sound administrative discretion and the legislative prerogative, but to be arbitrary and illegal."

Perpetuation of illegality by an administrative body by inflexible application of the principle of *res judicata* is impermissible.

*Order affirmed.*
*Costs to be paid by appellants.*