# RALPH L. KLEIN ET AL. *v.* COLONIAL PIPELINE COMPANY

[No. 1465, September Term, 1982.]

*Decided July 8, 1983.*

The cause was argued before LISS, BISHOP and GETTY, JJ.

*John J. Gessner* and *Michael E. Leaf,* with whom were *Leaf, Hertsch & Handy* on the brief, for appellants.

*Gary C. Duvall,* with whom were *Miles & Stockbridge, Charles H. Reed, Gregory A. Szoka* and *Cameron, Reed, Keenan & Love* on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

Colonial Pipeline Company, appellee herein, filed an application seeking approval from the Board of Appeals of Harford County for a conditional use permit and variance to allow the construction and use of two additional petroleum storage tanks and accessory equipment at Colonial's Forest Hill, Maryland tank farm facility.

Colonial obtained the original zoning change for the subject property in 1964 from an "A-1" agricultural classification to an "M-2" manufacturing classification in order to erect a "break-out" tank farm on which five tanks were subsequently erected.[1] The original five tanks were built pursuant to the issuance of a zoning certificate by the Board of Appeals on June 4, 1965.

Subsequent to the construction of the tank farm, Colonial applied in 1976 for a conditional use permit and variance for

---

1. For earlier case history *see* St. Clair v. Colonial Pipeline Co., 235 Md. 578, 202 A.2d 376 (1963).

the construction of two additional tanks at the site. The request was denied on April 4, 1977 by the Hearing Examiner based upon a finding that Colonial had not met its burden on the availability of fire-fighting equipment and that it had not complied with the screening conditions in the Board's decision of 1965. Colonial appealed the Hearing Examiner's decision directly to the Circuit Court for Harford County under provisions of the County's Charter. The Circuit Court reversed the decision of the Hearing Examiner.

On appeal of the Circuit Court's decision, the Court of Appeals held in the case of *Klein v. Colonial Pipeline Co.,* 285 Md. 76, 400 A.2d 768 (1979), that the County's creation of such a direct right of appeal to the Circuit Court was "ultra vires and in conflict with the general public law." *Id.,* at 83. The Circuit Court was found in *Klein* to have no jurisdiction to hear the direct appeal due to the unconstitutionality of that portion of the County's Charter. Accordingly, the judgment of the Circuit Court was vacated and that Court was ordered to "dismiss the appeal from the order of the Hearing Examiner." The Hearing Examiner's decision became final under the Harford County Zoning Ordinance since no request had been made for final argument before the Board of Appeals. Accordingly, Colonial filed a new application in 1979 for a conditional use permit and variance pursuant to Section 20.36 of the Zoning Ordinance.

The matter was heard before the Zoning Hearing Examiner for the Board of Appeals who recommended approval of the variance and the conditional use permit subject to three conditions. Ralph L. Klein, *et al.,* appellants herein, filed a request for final argument before the Board of Appeals for Harford County. The Board of Appeals rejected the recommendation of the Zoning Hearing Examiner and issued a final decision which denied the conditional use permit requested by Colonial. Colonial thereupon appealed to the Circuit Court for Harford County. Appellants own property in close proximity to the tank farm facility and participated in the proceedings before the Hearing Examiner and the

Board of Appeals. They filed an answer to Colonial's petition of appeal and participated in the Circuit Court proceedings as respondents. By order dated August 9, 1982, the Circuit Court reversed the decision of the Board of Appeals and remanded the proceedings to the Board of Appeals for the entry of an order granting the application of the appellee for a conditional use permit to erect the two additional petroleum storage tanks. Appellants timely noted their appeal to this Court and raise the following issues to be determined by this appeal:

I. Did the lower court err in reversing the decision of the Board of Appeals where the Board of Appeals' denial of Colonial's application was based on substantial evidence and the issues presented were, at the very least, "fairly debatable"?

II. Did the lower court err in holding that the instant application by Colonial Pipeline Company for a conditional use permit is not barred by the doctrine of *res judicata*?

III. Did the lower court err in ordering the Board of Appeals to grant the requested conditional use where the evidence shows that Colonial's application fails to meet the mandatory requirements of the Zoning Ordinance?

I.

Colonial presented evidence in the course of the several hearings which established the following facts. Colonial is an interstate transporter of gasoline and petroleum distillates. The petroleum product is shipped from origination points in Texas, Louisiana, and Mississippi through a main line system which terminates in Linden, New Jersey and delivers product being shipped for its customers at various points along that route through "lateral" lines. The main pipeline is thirty inches in diameter as it enters Harford County. There is a lateral pipeline which is only eight inches in diameter from the Colonial facility at

"Aberdeen Junction" (the tank farm's name) to a terminal in Baltimore where Colonial's customers receive their product. Due to the hydrolics of transferring product from a larger to a smaller size pipeline, the flow of petroleum products cannot be directly switched from the main line to the lateral line, but has to be diverted to holding or "break-out" tanks where it remains, pending dispatch via the lateral line to the terminal. A break-out tank thus provides only temporary storage.

At the time of the hearings, Colonial was shipping 44,000 barrels per day of refined petroleum product through the Aberdeen Junction facility. However, Colonial is unable to meet the present demand from its customers for deliveries through Aberdeen Junction and has a 10,000 barrel per day short-fall. In order to meet this demand there must first be an expansion of the on-site break-out capacity at the tank farm.

The petroleum products shipped by Colonial are held in two types of break-out tanks. A "fixed roof tank" is a steel cylindrical tank with a permanent cone roof. It will hold petroleum distillate products such as fuel oil and diesel oil. The fixed roof tank is required to be constructed in accordance with the American Petroleum Institute (API) regulations as to standards and quality control as prescribed by the Federal Department of Transportation standards set forth at 49 C.F.R. Part 195. The standards call for a "weak seam" weld between the cone roof and the steel shell. The weld is designed so that if a possible ignition were to take place within the tank, the weld would disintegrate causing the roof to separate from the shell, thus releasing any accumulated vapor pressure. The fixed roof tank is designed to contain the vapors given off by the petroleum distillates. Conservation vents in its roof operate to allow a portion of any vapors to escape after sufficient pressure has accumulated.

The floating roof tank is designed to permit the roof of the structure to be suspended upon the petroleum product in the tank. This design inhibits the accumulation of vapor by

reducing the vapor space within the tank. The flotation system has seals constructed of a synthetic rubber compound which prevent the escape of any accumulated vapors into the environment.

The floating roof tank and the fixed roof tank are designed to hold petroleum products which have different chemical compositions and natures. Both gasoline and fuel oil are flammable but are classified as non-explosives. The volatility of distillate fuel oil is less than that of gasoline, and is only required to be held in a fixed roof tank. The flash point of fuel oil is approximately 140°, which means that the fuel oil must be heated to that temperature before sufficient vapors are generated to be subject to a flash and ignition.

The existing break-out capacity at the tank farm includes four floating roof tanks and one fixed roof tank. Each break-out tank holds only one product. Both the proposed fixed and floating roof tanks are subject to various governmental regulations. They are to be constructed in accordance with standards of The American Petroleum Institute and the design, operation, and safety standards of the United States Department of Transportation, which regulates the proposed tanks. The Environmental Protection Agency with Maryland air quality rules and regulations also apply to the vapor emissions and the design of the two types of tanks.

There was considerable testimony before the Board pertaining to the fire-fighting system to service the proposed additional tanks as well as the presently existing tanks. Additionally, evidence was presented by Colonial with respect to the dynamics of a petroleum product fire as it bears upon optimal design and the function of a fire-fighting system.

Since the distillate does not produce flammable vapors at ambient temperatures, a spark applied to a distillate product would not, as appellants' expert stated, produce an ignition. A fuel oil fire ignition would have to take place at the point where the product meets the oxygen source, since only the vapors burn. Such a fire would burn at the surface and produce heat only at the surface. Furthermore, the tank

shell would not lose its structural integrity or its ability to contain the product. Therefore, the tanks are designed to hold product even if on fire and it is not characteristic of refined petroleum fires to boil or spill over the sides of the tank.

Both appellants and appellee agreed that the most likely source of ignition of a tank fire is lightning. To protect against this possibility, the Colonial facility maintains lightning arresters, which ground the tanks from lightning strikes.

As noted before the Hearing Examiner, the primary consideration in the design of a petroleum fire-fighting system is prevention. It is more desirable to design passive forms of fire protection, such as seals, vents, and arresters, than a system to extinguish a fire. The existing fire companies have the capability to mount an attack against a fully involved fire at the Aberdeen Junction site. The fire department could easily extinguish a grass fire; cool adjacent tanks; or extinguish the fire and save the product. However, in the design of a fire protection system for petroleum storage facilities, one does not always plan on extinguishing the fire. It may be far better to simply let the product be consumed by the fire until it burns out. According to Colonial's experts, the area surrounding the Colonial facility would not have to be evacuated because any danger from a fire would be remote. The Board of Appeals found that no one lives within a 1/4 mile radius of Colonial's facility.

The National Fire Code, as formulated by the National Fire Protection Association, and federal standards require the erection of earthen dikes surrounding the tanks. The present facility has a system of dikes. Originally, the dikes were used in the pipeline industry to contain the product if a tank collapsed. Since the advent of the welded tank replacing riveted tanks, there has not been a tank collapse but, the dike and its impoundment serve to prevent the possible spread of product in the event of a leak from whatever source, fire-related or otherwise.

The present Colonial dike system is capable of holding 120% of the contents of the largest tank, which has a capacity of 150,000 barrels. The capacity of the dikes, which will be increased with the addition of the two proposed tanks, is designed in conformance with the requirements of the National Fire Code. In the possible event that a fire is ignited with a spill involving both dikes and tank, it is an acceptable fire fighting alternative to allow the entire impoundment area to burn. Aside from the loss of a product, there would be no danger to the surrounding community.

In addition to the tank design, siting, and the dikes, the Colonial tank farm is equipped with an on-site fire extinguishing system. The system includes a pump which moves water from a retention pond into a 4-inch underground pipeline to hydrants located by the tanks. This water pipeline is entirely underground with the exception of the hydrants and valve stands. The pond holds 20,000 barrels of water and, by design, has the ability to retain 8,000 barrels of petroleum products should a spill somehow move beyond the tanks and the dikes.

The Colonial system has the capability to pump water from the pond, through the pipeline, and introduce a foam concentrate into the system which is used in the fighting of petroleum product fires. The foam is combined with the water to blanket a possible fire and deprive it of an oxygen supply.

Foam solution can be spread over the roof of the floating roof tank by a pipeline affixed for this purpose. The line is a flexible line which rises and contracts with the movement of the roof. Appellant's expert, Richard Woodward, testified that the system at Aberdeen Junction would be adequate to extinguish a fire.

The mechanics of combating a fire in a fixed roof tank differ from those employed on a floating roof tank. Foam lines do not run to the roof of a fixed roof tank nor would foam be generated directly into the tank from a pipeline. Rather, foam would be made available to a fixed roof tank through hydrants adjacent to the tank and hose lines would

connect to the hydrants in order to generate the foam solution and spray it onto the tank. Although floating roof tanks are regulated to require a foam delivery system, the fixed roof tank is not required to have one either by Federal, State or industry standards. The experience in the industry has shown that there is no necessity to provide a foam system to tanks which contain distillate fuels, diesel and fuel oils since these products have a high flash point and minimal vaporization.

In the event of a fire in one of the fixed roof tanks, Colonial has protein foam already introduced in its fire extinguishing system. It has additional foam stored on-site, which can be delivered into the system. As a further back-up, Colonial has available to it a supply of protein foam at its Dorsey Junction tank farm in Carroll County, as well as a contract with Rockwood Systems and 3-M companies to air-lift additional foam supplies to the site if such additional quantities of foam were required.

On the first report of a fire, the evidence showed that the Bel Air, Forest Hill and Jarrettsville Fire Departments would be dispatched. The Forest Hill Station, which was opened after the 1976 application by Colonial, would be the first to reach the scene, since it is only 3/4 of a mile from the Colonial property. The response time of the fire department at Forest Hill would be less than five minutes. The Forest Hill Station and the Bel Air Station each have foam capability and would be on the scene prior to the operation of the on-site system. In addition, there are several other units in Harford County and the surrounding counties which approximate the Bel Air and Forest Hill fire companies in foam capability.

No evidence was produced by either appellants or appellee of any superior tank farm fire-fighting system other than the one used by Colonial. In fact, Colonial was shown to have the only self-contained system in the pipeline industry and to be in conformance with all requirements of the National Fire Protection Association.

Appellants also raised objection at the hearings as to the location of the proposed Colonial tanks and dikes. Unrefuted testimony was presented by Colonial that the two proposed tanks will not encroach on the 200 foot set-back required by Section 15.02 of the Harford County Zoning Ordinance. While the proposed dikes are within the 200 foot set-back, they are not used for petroleum storage, but are, rather, safeguards required by industry and federal standards. The Hearing Examiner found the dikes of sufficient importance to screening the site and safety to warrant granting the variance. The Circuit Court affirmed that decision by its order of August 9, 1982.

After the 1976 Colonial application, Public Law 96-129 was enacted by Congress, Section 201 of which is the "Hazardous Liquid Pipeline Safety Act of 1979." This Act was not in effect at the time of the Hearing Examiner's decision on Colonial's previous application in April, 1977 but was in effect prior to the Board of Appeals decision in 1981 on the application which is the subject of this appeal.

An additional change after the previous 1976 Colonial application was the construction of the Forest Hill fire substation. Further, Colonial offered testimony that extensive additions of buildings and equipment to Harford County's fire departments took place between the two applications giving greater fire-fighting protection to the tank farm.

Appellant's expert witness, Mr. Woodward, was qualified as an expert concerning fire fighting and fire protection. He was the president of the Bel Air Volunteer Fire Department and was involved in the sale and design of fire-fighting equipment.

Mr. Woodward testified that the on-site system now in place at the tank farm facility is designed primarily to handle rim fires on the floating roof tanks. However, he stated his opinion to be that the on-site system now at the tank farm facility is fixed and does not have the mobility necessary to contain and fight a fire which occurs outside the limitations of the fixed system. Mr. Canavan, Colonial's

expert, agreed with this assessment. Mr. Woodward explained that, in the event a fire gets outside of the dike or a fire which occurs around the pumping station where the pumps and filters are, there is going to be a need for rapidly deployed mobile lines. The mobile capability would be necessary in the event of a spill in order to control the fire. Mr. Woodward testified that it would be necessary to deliver foam at a rate of 2,000 gallons per minute. Colonial's on-site equipment includes only two 60 gallon per minute nozzles. Colonial's system only delivers foam at the rate of 500 gallons per minute. In order to produce the needed application rate, additional foam proportioning equipment and nozzles and a larger supply of foam would be needed. Although the Bel Air Volunteer Fire Company has pumpers that have rates of flow from 1,000 gallons per minute to 1,250 gallons per minute, it does not have the proportioning equipment necessary to generate foam at the necessary rate.

Mr. Woodward stated that the Bel Air Volunteer Fire Company has as much capability as any other unit in Harford County to fight a fire at the tank farm facility. Jarrettsville Volunteer Fire Company, the next nearest fire company, only has one pumper with a 95 gallon per minute foam capability.

Mr. Canavan suggested that the volunteer fire companies could premix the foam. Mr. Woodward opined the suggestion was impractical for any large-scale effort. He contended the human task was too great and the ability to maintain any accuracy in the proportioning of the foam to water would be next to impossible.

Mr. Woodward also stated his opinion and concern about the reliability of the water supply at the Forest Hill tank farm. The pond at Forest Hill can contain up to 8,000 barrels of spilled petroleum product (the same amount that escaped from one of the ruptures at Manassas, Virginia). Since petroleum products are lighter than water, the oil or gasoline would float on top of the water. Mr. Woodward testified that it would not be safe to send in a pumper to connect to the draft hydrant adjacent to the pond because of the severe

risk of igniting vapors from the ignition system on the fire equipment. Mr. Canavan said that he would first cover the surface of the pond with foam and then go ahead and either start up the Colonial pumper or drop a suction line into the pond so that the fire companies' pumpers could draft water from the pond. Mr. Woodward pointed out that this was not an acceptable solution since it placed the lives of the firemen at risk. Mr. Woodward testified that any break in the foam blanket would allow vapors to escape which could be ignited by the equipment. Mr. Woodward further pointed out that a fire at an oil refinery in Philadelphia had cost the lives of eight firemen when, after the fire appeared to be contained by a complete blanketing with foam, a break in the foam surface allowed vapor to escape which was ignited. Mr. Woodward explained that such a break in the foam barrier could be caused by wind, movement of a suction line or from the turbulence generated by the operation of the pumps.

In order to have an adequate fire-fighting capability available at the Colonial facility, Mr. Woodward testified that a completely reliable water supply source was needed. He suggested a pond in reasonable proximity to the facility but segregated from the present pond which serves the dual purpose of water supply and petroleum containment. Such a pond should be close enough that lines could be extended to fight a fire where needed but far enough away as to eliminate the risk of ignition of vapors. In addition, Mr. Woodward testified that one or more proportioners would be needed in order to provide application rates of 2,000 gallons per minute. Such equipment should be mobile and should be stored at some point other than in close proximity to the facility so that it could not be disabled by a fire. The foam supply should likewise be mobile and should be stored at some point further removed from the tanks in a containment area. Colonial has not provided the necessary equipment, and Mr. Woodward has testified that such equipment is not available to the Bel Air Volunteer Fire Company or to any other fire company in the County. He further testified that the acquisition of such equipment is beyond the budget capabilities of the volunteer fire companies.

The installation of the two additional tanks at the location here involved is authorized under the Zoning Ordinance of Harford County Article 15, § 15.02 which, subject to Board authorization, permits the use of M-2 General Industrial District as conditional uses for petroleum or petroleum products refining or storage above ground.

Section 15.05 sets out the required conditions which must be met before conditional uses may be granted. Section 15.051 requires that "[t]he *best practicable means* known for the disposal of refuse matter or water-carried waste, the abatement of obnoxious or offensive odor, dust, smoke, gas, noise or similar nuisance, *and protection against fire and explosion, shall be employed."* [emphasis supplied].

The Board based its denial of the application for a conditional use in this case on a failure by Colonial to comply with the requirements of Section 15.051 concerning fire protection as well as the failure of the appellee to comply with the requirement of screening the premises from view which was included in the original grant of a conditional use which permitted the installation of the tank farm facilities in 1965.

There is no question that there is evidence of problems which might occur in the fighting of a major fire at the Colonial facility. The Board apparently imposed a burden on Colonial which is not required by the Zoning Ordinance. It found that "Colonial Pipeline has not met its burden of proof on this issue by the presentation of *substantial evidence to show that it has the best possible known means for protection for fire and explosion."* [emphasis supplied]. The trial court, in reversing the Board, pointed out that the ordinance required only that Colonial prove that it has provided and will provide "the best practicable means known for protection against fire and explosion." The evidence before the court indicated that in the period of approximately 15 years since Colonial began its operation at Aberdeen Junction there had not been a fire and that there was no history of major fires in the history of this pipeline. We agree with the trial judge that to accept the standard proposed by the Board would require Colonial to plan for all *possibilities* rather

than all *probabilities.* Under these circumstances, it might have been required that Colonial supply its own fire company, equipped and staffed to a capacity to control all dangers no matter how unlikely their occurrence. This, as the trial judge below held, was not contemplated by the zoning ordinance.

When the original conditional use was granted to Colonial in 1965, certain conditions were imposed which included the following:

> That appellant plant a screen of evergreen trees and maintain them so that the structures themselves will eventually not be visible from any neighboring property; and existing trees that are on the property be left there so far as construction might permit.
>
> That the present density of screening by trees and vegetation be maintained and be augmented by planting evergreen trees at locations where no screening exists at present and where the structure will be visible from other properties, to the end that the proposed tank farm and its appurtenances be as invisible from its neighbors as it reasonably can be made.

The Board gave as one of its reasons for denying appellant's application the failure of Colonial to comply fully with the conditions imposed by the Board in its grant of a conditional use for the installation of a tank farm in 1965.

We are, of course, aware of the general rule that in reviewing the action of a board of appeals, a court may not substitute its judgment for that of the Board unless the Board's action is found to be arbitrary, capricious, and illegal. *Crowther, Inc. v. Johnson,* 225 Md. 379, 170 A.2d 768 (1961). The trial judge found that the Board was arbitrary when it grounded its denial of Colonial's application upon standards which were not required by the Zoning Ordinance. The denial was not justified by the Board's conclusion that Colonial had failed to meet its burden to present substantial

evidence that it provided the best possible known means for protection from fire and explosion. The Board also was found to be arbitrary and capricious when it denied the application because of a failure to comply fully with conditions imposed on a prior grant of a conditional use more than 15 years before the pending application. We agree with the trial court that there were other zoning enforcement tools available to the Board and the County to compel compliance with the conditions imposed in 1965, and that the rejection of the pending application because of a failure to comply with the conditions was not appropriate.

It is an improper exercise of the Board's and the Hearing Examiner's function to transform zoning application proceedings into a violation and enforcement process:

> Absent a specific standard authorizing a board to consider such matters, it is beyond the authority of a board of adjustment to decline to issue a special permit because of prior violations by the applicant . . . nor may a special permit be refused because the applicant committed isolated and minor violations of the conditions of a previous permit.

*See* 3 Anderson, *American Law Zoning,* § 19.24 (1976); *see also Dowd v. Board of Appeals of Dover,* 360 N.E.2d 640 (Mass. App. 1977); *Pokoik v. Silsdorf,* 390 N.Y.S.2d 49, 358 N.E.2d 874 (1976); *Bartz v. Board of Adjustment,* 80 Wash.2d 209, 492 P.2d 1374 (1972); *Wyss v. Zoning Board of Review of the City of Warwick,* 209 A.2d 225 (R.I. 1965).

We hold that the trial court did not err in reversing the action of the Board.

## II.

Appellants argued below and here that Colonial's application filed in this case was barred by *res judicata.* In 1976, Colonial had made an application for a conditional use permit similar in a number of respects to the application in this pending case. In 1977, the Hearing Examiner for

Harford County denied the application of Colonial upon a showing that Colonial did not have adequate availability of fire-fighting equipment and that Colonial had not complied with the screening conditions imposed by the Board of Appeals in 1965. Subsequently, Colonial entered a direct appeal to the Circuit Court for Harford County which reversed the Hearing Examiner. The Court of Appeals, in *Klein v. Colonial Pipeline Co., supra,* reversed the Circuit Court on the basis that the court was without jurisdiction to hear the case because the appeal procedure enacted by Harford County was *ultra vires.*

Appellant contends that the doctrine of *res judicata* applies and that facts or issues that were litigated in a prior proceeding and were determined by a court of competent jurisdiction may not be litigated in a subsequent action between the same parties or their privies. *See Pat Perusse Realty Co. v. Lingo,* 249 Md. 33, 35, 238 A.2d 100 (1968). This doctrine is clearly applicable to final *judicial* determinations but the Court of Appeals has stated on a number of occasions that *res judicata* does not apply to administrative proceedings as an inflexible rule of law. *Cicala v. Disability Review Board for Prince George's County,* 288 Md. 254, 263-264, 418 A.2d 205 (1980); *Gaywood Community Association v. Metropolitan Transit Authority,* 246 Md. 93, 100, 227 A.2d 735 (1967). This is particularly true where, as in this case, the administrative agency's original decision was based on an error of law.

In *Board of County Commissioners of Cecil County v. Racine,* 24 Md. App. 435, 332 A.2d 306 (1978), a zoning application was filed by Racine for zoning and sanitary permits. The application was denied by the Hearing Examiner and by the Board of Appeals. Racine noted on appeal to the circuit court which dismissed the appeal on the ground that it had not been timely filed. No judicial determination on the merits was ever made. Some six years later, Racine filed an application identical to the original one. The Board of Appeals denied the application on the grounds of *res judicata* because there had been no substantial change in conditions.

Both appellants and appellee agree that the law established in *Racine* amounts to an exception to the normal doctrine of *res judicata.* This Court, in *Racine,* was dealing with a situation where there was an error of law. We said in that case [24 Md. App. at 451], that "[i]n the subject case we are called upon to determine whether the rule giving binding effect as between the parties, to a final decision of a zoning board extends to a decision by such a body that *solely* is the product of an error of law." [emphasis in original].

We concluded that the Board had misinterpreted the Zoning Ordinance in 1967, thus rendering its decision on the law arbitrary and capricious. *Racine, supra,* at 443. After noting that Maryland rejects any distinction between questions of fact and error of law in applying the doctrine of *res judicata,* we asked "[s]hould such an inflexible rule of law be made applicable to errors of law by administrative bodies?" and we answered, "We think not." *Id.,* at 450.

This Court concluded that an unreversed final decision by a zoning board cannot foreclose subsequent applications where "there has been a substantial change of conditions or it is shown that the decision was a product of fraud, surprise, *mistake* or inadvertence. . . ." *Id.,* at 450 [emphasis in original].

The 1977 Hearing Examiner's decision was reversed by the Circuit Court for Harford County on the merits. The Circuit Court found that appellant's expert testimony clearly established that Colonial's fire-fighting system was adequate. Further, the Circuit Court held that the Hearing Examiner's denial of the conditional use and variance request "was also legally in error" because the alleged non-compliance with Conditions 5 and 6 of the original zoning certificate were governed by Sections 19.1, 19.4, 19.41, 19.5 of the Harford County Zoning Ordinance which concerned violations and enforcement of the Ordinance. None of these alleged violation sections were included in Section 20.42 of the prescribed guidelines for the consideration of the granting of a conditional use and did not form a basis for denial of such an application. On appeal,

these findings were not set aside by the Court of Appeals because they were factually incorrect, but the Court concluded that the circuit court was without jurisdiction to hear Colonial's appeal because of the unconstitutionality of the direct appeal portion of Harford County's charter. *See Klein v. Colonial Pipeline Co., supra.* Under these circumstances, the sole judicial review of the 1977 Hearing Examiner's decision made by the circuit court was a finding that a denial of the conditional use application was arbitrary, capricious and illegal. We said in *Racine* at p. 452:

> [T]he principle of *res judicata* should not apply to an erroneous determination of law by an administrative body. Any other course would approach, if it did not reach, a deprivation of constitutional dimension. In any event, unrelaxed application of the doctrine would constitute a manifest unfairness to Racine.

> We are guided to our conclusion by the language used in a very recent decision of the Court of Appeals of Maryland, *Criminal Injuries Compensation Board v. Joseph D. Gould,* 273 Md. 486, 331 A.2d 55 (1975), wherein it was said at 521 [76]:

>> "Mistaken interpretation of law, however honestly arrived at, [is] held not to be within the exercise of sound administrative discretion and the legislative prerogative, but to be arbitrary and illegal."

> Perpetuation of illegality by an administrative body by inflexible application of the principle of *res judicata* is impermissible.

### III.

Colonial offered at the hearing on the pending application evidence of additional fire protection facilities which had been installed subsequent to the 1977 case. In addition, there was substantial evidence of a change in the legal

status of the regulation of Colonial's pipeline after 1977. The testimony before the Board of Appeals made it clear that Colonial was actively engaged in the interstate transportation of refined petroleum products. Regulation of the pipeline industry had originally been vested in the Interstate Commerce Commission and then transferred to the Federal Energy Regulatory Commission and to the Department of Transportation.

On November 30, 1979, the "Hazardous Liquid Pipeline Safety Act of 1979" was enacted by Congress. The Act declared that the States were pre-empted from adopting or maintaining in force safety standards applicable to interstate pipeline facilities or to the transportation of hazardous liquids associated with such facilities. The Secretary of Transportation is, by virtue of the Act, authorized to establish minimum federal safety standards for the transportation of hazardous liquids and pipeline facilities. Colonial contends the adoption of this Act makes any attempt by a State or local jurisdiction to regulate the construction, design, maintenance and safety of petroleum interstate pipelines and their attendant facilities an unconstitutional burden on interstate commerce in an area pre-empted by federal authority. At the least the adoption of the Act since the application in 1977 makes *res judicata* inapplicable in this case.

The trial judge did not find it necessary to decide whether the denial of the conditional use created an impermissible burden on interstate commerce. His order reversing the final

decision of the Board of Appeals and remanding the case to the Board with directions to grant the application obviated the necessity for the consideration of this issue. As we shall affirm the order of the trial court it will not be necessary for us to consider this issue. We shall adopt the decision of the trial court as to the payment of costs.

*Order affirmed, costs to be divided equally between the parties.*