**EXXON CORPORATION, Plaintiff,**

v.

**UNITED STATES SECRETARY OF TRANSPORTATION, Defendant.**

**No. CS–96–204–AAM.**

United States District Court, E.D. Washington.

April 4, 1997.

William D. Symmes and Leslie Weatherhead, Witherspoon, Kelley, Davenport & Toole, P.S., Spokane, WA and Robert C.

Harrison of Exxon Co. Law Dept, Houston, TX, for Plaintiff.

Pamela J. DeRusha, U.S. Attorney's Office, Spokane, WA and Angel Collaku, Dept. of Transp., Research & Special Programs, Washington, DC, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, *INTER ALIA*

McDONALD, Senior District Judge.

**BEFORE THE COURT** are the parties' cross-motions for summary Judgment. (Ct. Rec. 12 and 16). William Symmes, Esq., Leslie Weatherhead, Esq., Witherspoon, Kelley, Davenport & Toole, P.S., and Robert C. Harrison, Esq., Exxon Company, U.S.A., represent plaintiff. Pamela J. DeRusha, Esq., Assistant United States Attorney, and Angel Collaku, Esq., Research and Special Programs Administration (RSPA), represent defendant.

### I. PROCEDURAL BACKGROUND

On July 17, 1995, the U.S. Department of Transportation (DOT), Research and Special Programs Administration (RSPA), Office of Pipeline Safety (OPS), entered a Final Order finding plaintiff's (Exxon's) Spokane, Washington facility in violation of various DOT regulations pertaining to the "Transportation of Hazardous Liquids by Pipeline." 49 C.F.R. Part 195. These regulations were promulgated pursuant to the Hazardous Liquid Pipeline Safety Act of 1979, 49 U.S.C. § 60101, et seq. (hereinafter "HLPSA"). DOT's Final Order directed plaintiff to take certain action to bring it into compliance with pipeline safety regulations.

Plaintiff's complaint seeks a declaratory judgment that its terminal facilities in Spokane are not governed by or subject to the HLPSA or the regulations promulgated thereunder, and therefore that DOT's July 17, 1995 Final Order is invalid. Plaintiff alleges DOT acted in excess of its statutory and regulatory authority.[1]

---

1. The complaint also alleges DOT acted in excess of its constitutional authority. However, plaintiff's summary judgment motion and memorandum tenders no argument premised on the U.S.

Constitution. Accordingly, the only question presented is whether DOT exceeded its statutory and regulatory authority.

Defendant (DOT) filed an answer and counterclaim in response to the complaint, seeking judicial enforcement of its Final Order. On February 13, 1997, defendant filed a Motion to Withdraw Counterclaim. (Ct. Rec.28). Apparently, plaintiff has now complied with the requirements of the July 17, 1995 Final Order. Plaintiff does not oppose the motion. Accordingly, defendant's Motion to Withdraw Counterclaim (Ct.Rec.28) is **GRANTED** and the counterclaim is **DISMISSED** as moot. Defendant's Motion to Supplement the Administrative Record (Ct. Rec.25) is likewise **GRANTED**. The records to be supplemented pertain to plaintiff's compliance with the Final Order. The motion is unopposed.

■ Plaintiff (Exxon) contends its compliance with DOT's order does not render its complaint moot. Defendant has not moved the court for dismissal of the complaint on the basis of mootness. In order to review a case, a court must be presented with an actual controversy. An exception to the mootness doctrine is an issue which is capable of repetition, yet evading review. This exception is available only if the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and there is a reasonable expectation the same complaining party will be subject to the same action again. *Matter of Bunker Ltd. Partnership*, 820 F.2d 308, 312 (9th Cir.1987) (citations omitted).

In *Bunker*, the specific question was whether there was a reasonable expectation the Environmental Protection Agency (EPA) would again seek to enter and inspect Bunker's premises by obtaining an administrative warrant under a particular provision of CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act of 1980). The circuit found that a subsequent change in the CERCLA provision did not allow for such a reasonable expectation.

■ In the instant case, there is no indication of a change in the HLPSA. Therefore, it is reasonable to expect DOT will in the future continue to assert authority over Exxon's Spokane facility pursuant to HLPSA, inspect the facility on that basis, and write the plaintiff up for any further alleged regulatory violations. Accordingly, although the particular circumstances giving rise to this controversy have come to an end (i.e. Exxon has remedied violations of particular DOT regulations), it is appropriate for this court to decide the case on the basis of the "capable of repetition, yet evading review" exception.

## II. FACTUAL BACKGROUND

The parties agree there are no issues of material fact and the controversy can be resolved as a matter of law.

Exxon owns and operates a petroleum storage and warehouse facility in Spokane. This facility includes seven storage tanks which are connected to the Yellowstone Pipeline. Petroleum product is received via the pipeline and stored for delivery to customers. The Spokane facility has no devices which can be used to control or monitor the flow of product through the pipeline. Some of the product is "reinjected" into the pipeline for delivery to Exxon customers located further down the pipeline. For example, between April and September 1993, approximately 29% (1.53 million barrels) of product was reinjected into the pipeline. The remaining product was delivered to customers in the Spokane area, typically by truck transport.

On March 15, 1993, the Office of Pipeline Safety (OPS) conducted an on-site safety inspection of the Spokane facility. On August 20, 1993, OPS issued to plaintiff a Notice of Probable Violation and Proposed Compliance Order, alleging various violations of HLPSA regulations. Plaintiff contested the "Notice" and eventually a hearing was had before OPS on February 3, 1994. On July 17, 1995, OPS issued its Final Order finding plaintiff was in violation of various regulations and ordering compliance therewith.

OPS concluded plaintiff is engaged in the transportation of hazardous liquid as defined by 49 U.S.C. § 60101(a)(22): " ... the movement of hazardous liquid by pipeline, **or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce.**" (Emphasis added). Based on plaintiff's admission it had reinjected into the pipeline as much as 29% of the hazardous

liquid in its tanks, OPS found plaintiff's tanks "are not being used simply for storage, but are being used to efficiently provide petroleum product to purchasers downstream." According to OPS, plaintiff's tanks are used for "temporary holding purposes for subsequent reinjection of petroleum products into the line." (Administrative Record (AR), Ex. 10 at pp. 2–3).

Furthermore, OPS found plaintiff's tanks are "breakout tanks" as that term is defined in the applicable regulation, 49 C.F.R. § 195.2(b), because they are used to "receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline." (AR, Ex. 10 at p. 2).

## III. DISCUSSION

### A. Standard of Review

5 U.S.C. § 706 provides that a reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. Among the powers of the reviewing court is to hold unlawful and set aside agency action, findings and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right. 5 U.S.C. § 706(2)(C). A reviewing court may also hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

According to *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), when a court reviews an agency's construction of the statute which it administers, there are two questions which must be addressed. First, is whether Congress has directly spoken to the precise question at issue. "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If the statute is silent or ambiguous with respect to the specific issue, the question is whether the agency's answer is based on a permissible construction of the statute. *Id.*

at 843, 104 S.Ct. at 2781–82. The court need not conclude the agency construction was the only one it (the agency) permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. *Id.* at 842, n. 11, 104 S.Ct. at 2782 n. 11.

If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to formulate an appropriate regulation. Such regulations are controlling unless they are arbitrary, capricious, or manifestly contrary to the statute. If the legislative delegation is implicit, the court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. *Id.* at 843–44, 104 S.Ct. at 2781–83. "[C]onsiderable weight is to be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Id.* at 844, 104 S.Ct. at 2782–83. The court must defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose. *Chemical Mfrs. Ass'n v. U.S.* E.P.A., 919 F.2d 158, 162–63 (D.C.Cir.1990), *citing, Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83.

### B. Are the tanks within the definition of 49 U.S.C. § 60101(22)(A)?

Defendant contends that since plaintiff's tanks are connected to the Yellowstone Pipeline and are used to receive petroleum product and reinject it into the pipeline, they are used in the "storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline." Defendant asserts 49 U.S.C. § 60101(22)(A) unambiguously confers authority over the plaintiff's tanks. According to defendant, plaintiff's storage of petroleum product is "incidental" to the movement of that product by the pipeline:

> The storage tanks act as a way station, storing petroleum products during the course of its transportation from one point to another. By utilizing the pipe-line system in this manner, this type of storage takes full advantage of the benefits of pipeline transportation by storing hazardous liquid until such time as it is economically

and logistically feasible to continue the movement towards ultimate delivery of the product. It is in just such a manner that Plaintiff's tanks are being used, and thus is a type of storage clearly contemplated by statute. **Indeed, the storage would even be 'incidental' if the product were never reinjected into the long-distance pipeline but continued to ultimate delivery via truck transportation.**

(Emphasis added).

Plaintiff contends defendant's interpretation of "incidental" is so broad it transforms HLPSA's limited applicability to storage facilities into general applicability. According to plaintiff, the defendant's interpretation is that Congress intended the HLPSA to apply to "**any** storage facility where **any** amount or **any** portion of an amount of petroleum received by pipeline is **ever** subsequently shipped from that storage facility." Plaintiff asserts this interpretation is erroneous, particularly in light of regulations which the defendant has promulgated pursuant to HLPSA. Plaintiff contends the **only** storage facilities to which HLPSA regulations apply are "breakout tanks." 49 C.F.R. § 195.2. Plaintiff contends its storage tanks are not "breakout tanks" which are "necessary and integral" to the operation of the pipeline.

Viewing the statutory provision (49 U.S.C. § 60101(22)(A)) **by itself,** the court finds the language contained therein is unambiguous. It refers simply to "storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline." The statute says nothing about the storage facility being "necessary" or "integral" to operation of the pipeline; nothing about the storage facility controlling or monitoring the flow in the pipeline; and nothing about the storage facility and the pipeline being owned in common.[2]

Congress intended 49 U.S.C. § 60101(22)(A) to be read fairly broadly. According to the legislative history:

The phrase, "movement ... by pipeline", is intended to mean **all aspects of any pipeline transportation in or affecting interstate commerce.** However, the Committee modified this definition by adding 'except that it shall not include any such movement through gathering lines in rural locations or onshore production, refining, or manufacturing facilities or storage or in-plant piping systems associated with any of those facilities.'... **It is not intended that safety authority over storage facilities extend to storage in marine vessels or storage facilities other than those which are incidental to pipeline transportation.**

**1979 U.S.Code Cong. and Adm. News at pp. 1971, 1988** (emphasis added).

Plaintiff's facility certainly does not qualify as a "marine vessel." Secondly, it is undisputed the facility is connected to the pipeline, thereby making it "incidental" to pipeline transportation. It is clear Congress did not intend HLPSA to apply to just any storage facility—the facility must be "incidental" to a pipeline. However, if the facility is "incidental" to the pipeline (i.e. connected thereto), the HLPSA applies regardless of the amount of hazardous liquid received from the pipeline and subsequently shipped either further down the pipeline or by some other method of transport. Based on the statute **alone,** it reasonably appears, as plaintiff suggests, that storage would be "incidental" even if the product were never reinjected into the pipeline, but removed from the tanks and delivered via truck transportation.[3]

---

2. According to plaintiff, the Exxon Spokane terminal and the Yellowstone Pipeline share neither common ownership or common operation. Plaintiff acknowledges the pipeline is partially owned by Exxon Pipeline Company which it asserts is "an entirely separate and distinct corporation" from Exxon Corporation.

3. This may not be true under the accompanying regulations. See discussion **infra.** The regulations are restricted to storage facilities which are used to relieve surges in the pipeline system or which receive and store hazardous liquid trans-ported by a pipeline for reinjection and **continued** transportation by pipeline. 49 C.F.R. § 195.2. Continued transportation by truck appears to be outside the scope of the regulation. See also 49 C.F.R. § 195.1(b)(7) (Part 195 does not apply to transportation of hazardous liquid through facilities located on the grounds of a materials transportation terminal that are used exclusively to transfer hazardous liquid between non-pipeline modes of transportation **or between a non-pipeline mode and a pipeline.** Delivery via truck is clearly a "non-pipeline mode" of transportation.)

Where things get interesting is how the applicable regulations are to be construed in conjunction with the statute and even then, whether it matters in the face of unambiguous statutory language. Plaintiff contends it does matter, asserting that even if the HLPSA is applicable, the regulations clearly do not cover its Spokane facility.

## C. Are the tanks within the scope of the regulations?

49 C.F.R. § 195.2 defines "breakout tank" as a tank used to (a) relieve surges in a hazardous liquid pipeline system or (b) receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline. Both parties cite to language used by the Material Transportation Bureau (MTB), the predecessor agency to RSPA, when it promulgated the regulation:

> It is the MTB's intention that **current** applicability of Part 195 to storage be limited to tanks used for the following two kinds of storage functions. First, tanks used to relieve surges in a hazardous liquid pipeline. This is sometimes called working tankage or a form of operating tankage. **Second, tanks used to receive hazardous liquid from a pipeline for continued transportation. This type of storage aids in the dispatching of different types and grades of hazardous liquids through a pipeline system.**

46 Fed.Reg. 38357, 38358 (emphasis added).

According to defendant, this language reveals that its authority under the HLPSA to prescribe and enforce safety standards with respect to storage "incidental" to the movement of hazardous liquids by pipeline is much broader than that which it is currently exercising via the regulations set forth, in 49 C.F.R. Part 195. Nonetheless, defendant asserts plaintiff's tanks qualify as "breakout tanks" within the purview of the regulations because they are used to "receive hazardous

liquid from a pipeline for continued transportation."

Plaintiff disagrees. According to plaintiff, "breakout tanks" are necessary and integral to the operation of the pipeline as they exist "for the purpose of receiving product from a pipeline and temporarily storing that product for the purpose of reinjection and continued transportation by pipeline." Plaintiff contends its tanks do not qualify as "breakout tanks" because they are not "necessary" and "integral" to the operation of the Yellowstone Pipeline. As evidence that its tanks are not "necessary" and "integral" to the operation of the Yellowstone Pipeline, plaintiff notes: 1) its Spokane facility and the Yellowstone Pipeline share neither common ownership or common operation; 2) its Spokane facility has no pressure control or monitoring devices to benefit the pipeline; and 3) "the vast majority of product stored at the Spokane Terminal leaves by means other than pipeline and that any introduction of the product from the Spokane Terminal to the YPL (Yellowstone Pipeline) is, at most, occasional and for Exxon's convenience because the opportunity for a sale further along the YPL has presented itself." Plaintiff argues its occasional shipment of product on the pipeline is insufficient to bring it within the purview of the regulations because otherwise the regulations would define " 'breakout tanks' as any storage which receives hazardous liquid from a pipeline system and which, at any time, injects hazardous liquid into that pipeline system."

On its face, 49 C.F.R. § 195.2 says nothing explicit about "breakout tanks" being "necessary" and "integral" to the operation of the pipeline. Certainly, a "breakout tank" used to relieve surges in a pipeline system **may** well be "necessary" and "integral" to a pipeline system. 49 C.F.R. § 195.2(a). It is likewise conceivable that in some circumstances, "breakout tanks" **may** be "necessary" and "integral" to the operation of a pipeline system.[4] However, all that 49

---

4. For example, plaintiff cites *Klein v. Colonial Pipeline Co.*, 55 Md.App. 324, 462 A.2d 546, 549 (1983), where the court explained how the "breakout tankage" involved **in that particular case** was necessary to the operation of the pipeline system:

> Due to the hydrolics of transferring product from a larger to a smaller size pipeline, the flow of petroleum products cannot be directly switched from the main line to the lateral line, but has to be diverted to holding or 'break-out'

C.F.R. § 195.2(b) says is a tank used to "receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline." It does not contain any qualifying language that such receipt and storage is "necessary" and "integral" to operation of the pipeline. It does not contain any language specifying a certain amount of product which must be reinjected into the pipeline at certain times. It does not state the tankage must be capable of controlling and monitoring the flow within the pipeline or that common ownership of the tankage and the pipeline is a relevant factor.[5]

■ It is undisputed some of the petroleum product received by plaintiff at its Spokane tanks is "reinjected" into the Yellowstone Pipeline for "continued" transportation to customers located down the line. Based on a plain reading of the regulation, plaintiff's tanks qualify as "breakout tanks."[6]

Plaintiff contends the defendant has previously interpreted "breakout tanks" as those "necessary" to operation of the pipeline system. Plaintiff refers to a 1971 Memorandum of Understanding (MOU) between the Environmental Protection Agency (EPA) and the DOT defining "non-transportation related onshore facilities" as excluding breakout tanks needed for the continuous operation of a pipeline system.

In its July 17, 1995 Final Order, the defendant dismissed this MOU as irrelevant "to the issue of how [plaintiff's] breakout tanks should be categorized in this pipeline safety enforcement action, because the MOU, and the EO [Executive Order] under which it was implemented, were written pursuant to the Clean Water Act ... not to the pipeline

safety laws." According to the order, "[I]t is not uncommon for the same term to take on different meanings under separate statutory authorities." (AR, Ex. 10, pp. 3–4).

In its briefing, defendant reasserts this position noting the purpose of the MOU was limited to "establishing policies and guidelines relating to the definition of transportation and nontransportation (sic) related onshore and offshore facilities and the responsibilities of the Environmental Protection Agency and the U.S. Coast Guard **with respect to the prevention of oil discharges** from vessels and onshore and offshore facilities." 36 Fed.Reg. 24080 (emphasis added). According to defendant, the pipeline safety regulations are designed to address a broad variety of issues relating to pipeline safety, not simply the prevention of oil spill discharges.

It is appropriate to accord the defendant some deference with regard to its interpretation of the impact of an MOU which is in excess of 25 years old. The interpretation appears reasonable.

Plaintiff contends the 1971 MOU is not the only evidence defendant has interpreted its regulations as applying solely to breakout tanks which are "necessary" to the continuous operation of a pipeline. Plaintiff refers to rule changes made by RSPA in 1994 resulting in a revamped 49 C.F.R. § 195.1(b)(7)(ii) which states Part 195 does not apply to transportation of hazardous liquid:

Through facilities located on the grounds of a materials transportation terminal that are used **exclusively** to transfer hazardous

---

tanks where it remains, pending dispatch via the lateral line to the terminal.

5. Indeed, according to 46 Fed Reg. at 38358, tanks used to relieve surges in a pipeline are referred to as "working" tankage or "operating" tankage. A reasonable implication is that the other type of "breakout" tank-tanks used to receive hazardous liquid from a pipeline for continued transportation is not "working tankage" or "operating" tankage.

6. The plaintiff cites a February 7, 1994 memo from the Regional Director of OPS in which he cites data he claims "contributes to the contention that Exxon's tankage is an integral part of

YPL." (AR, Ex. 7, p. 2). According to plaintiff, this amounts to an admission by OPS that "breakout tanks" are only those tanks which are "necessary" and "integral" to operation of the pipeline.

On the contrary, all this memo represents is a response to plaintiff's assertion that it "should not come under DOT jurisdiction .... based on [its] idea that [its] tankage is not necessary for the operation of the YPL." (AR, Ex. 7, pp. 1–2)(emphasis added). Nothing in the memo indicates it is defendant's "idea" that "breakout" tankage must be "necessary" and "integral" to operation of the pipeline in order to fall within the purview of the regulation.

liquid ... between non-pipeline modes of transportation or between a non-pipeline mode and a pipeline, **not including any device and associated piping that are** *necessary* **to control pressure** in the pipeline under § 195.406(b).

(Emphasis added). In proposing the rule change, RSPA stated the exception contained in § 195.1(b)(7) did not include "breakout tanks and associated piping, for these facilities are not used exclusively for transfers between non-pipeline and pipeline modes." 57 Fed.Reg. 56304, 56305. According to plaintiff, this amounts to an acknowledgement by RSPA that the "device" referenced in § 195.1(b)(7) is a "breakout tank" and that such a tank must be "necessary" to operation of the pipeline in order to fall within the scope of Part 195.

This is too much of a stretch. According to defendant, the failure to except "device[s] and associated piping that are necessary to control pressure" does not mean that all storage must be necessary to the operation of a pipeline system. Defendant asserts the "devices" referenced, (i.e. those that are indeed necessary to control pressure) "are never excepted because they are operationally part of the [pipeline] and are unrelated to storage." This interpretation is reasonable and persuasive.

It appears § 195.1(b)(7) is readily and reasonably harmonized with the definition of "breakout tank" contained in § 195.2. First of all, as defendant notes, plaintiff does not qualify for the exception contained in § 195.1(b)(7) because, by its own admission, plaintiff's Spokane terminal is not used "exclusively to transfer hazardous liquid ... between non-pipeline modes of transportation or between a non-pipeline mode and a pipeline." Although some of the product is transferred from the pipeline to trucks, some of it is shipped further down the pipeline.

Furthermore, although § 195.1(b)(7) refers to "devices" used to control pressure, § 195.2 refers not only to breakout tanks designed to relieve surges in the pipeline system (i.e. control pressure), but to tanks used simply "to receive and store hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline." More-

over, as noted above, regulation of tanks which are not used to control the pressure in the pipeline is not inconsistent with congressional intent that "movement ... by pipeline" means "all aspects of any pipeline transportation in or affecting interstate commerce."

Plaintiff points out how the Environmental Protection Agency (EPA) at one time "proposed" to define "breakout tanks" versus "bulk storage" tanks. The EPA proposed to define "breakout tank" as a "container that is part of a pipeline facility regulated by the Department of Transportation and used solely for the purpose of compensating for pressure surges or to control and maintain the flow of oil through pipelines." It proposed to define "bulk storage tank" as "any container used to store oil" and "used for purposes, including, but not limited to, the storage of oil prior to use, while being used, or prior to further distribution in commerce." 56 Fed. Reg. 54612, 54631 (Proposed Rules, Environmental Protection Agency, 40 C.F.R. Part 112, Oil Pollution Prevention; Non-transportation-related Onshore and Offshore Facilities, October 22, 1991). The definition was proposed to clarify the distinction between facilities regulated by DOT and EPA: "EPA regulates facilities with bulk storage tanks. Breakout tanks are used to compensate for pressure surges or control and maintain pressure through pipelines. These tanks are frequently in-line and are regulated by DOT." 56 Fed.Reg. at 54618.

Plaintiff contends EPA's proposed rules indicate the only storage facilities regulated by the DOT are those "breakout tanks" necessary to operation of a pipeline system. Plaintiff contends its tanks are "bulk storage tanks" and thus, fall exclusively within EPA jurisdiction.

First of all, it is not clear whether EPA's proposed definitions were in fact ever adopted as part of a final regulation. Secondly, if they were, it appears they are no longer part of the EPA regulations currently found at 40 C.F.R. § 112.2 (revised as of July 1, 1996). Thirdly, the EPA regulations are narrowly restricted to "oil" as opposed to the "hazardous liquid" addressed by the DOT regulations at 49 C.F.R. Part 195. Fourthly,

and most importantly, the relevant inquiry concerns "the agency's construction of the statute which it administers." *Chevron U.S.A.*, 467 U.S. at 842, 104 S.Ct. at 2781. DOT, not EPA, administers the Hazardous Liquid Pipeline Safety Act.

Plaintiff contends its Spokane tankage has been under EPA jurisdiction since it was built in 1954 and that defendant (DOT) now seeks to expand its jurisdiction to also cover this tankage. According to plaintiff: "[T]he Secretary's [DOT's] jurisdictional power play exposes Exxon and other similarly situated petroleum shippers to the perils of overlapping, and potentially conflicting, regulation by the EPA and the Secretary."

DOT has not "expanded" its jurisdiction. It is merely exercising jurisdiction it has always had under the HLPSA and accompanying regulations. If EPA's regulations are overlapping and potentially conflicting, plaintiff's remedy does not lie in the courts. Its remedy lies with Congress or with the respective agencies (DOT and EPA).

## IV. CONCLUSION

Defendant's assertion of jurisdiction over plaintiff's tankage-the tankage connected to the pipeline-does not exceed defendant's statutory authority under the HLPSA. Insofar as tankage connected to a pipeline, the statute is clearly and unambiguously applicable "storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline."

It is not clear whether Congress explicitly left a gap for DOT to fill concerning a definition of the "storage" to which HLPSA pertains. If Congress did so, defendant's regulation (49 C.F.R. § 195.2) is neither arbitrary, capricious, or manifestly contrary to the statute. Indeed, it appears the regulation narrows the definition of "storage" from

that which is intended by statute. If Congress implicitly delegated to DOT the responsibility for providing a definition of storage "incidental" to movement of hazardous liquid by pipeline, the interpretation made by DOT, via 49 C.F.R. § 195.2, is a "reasonable" one.

In any event, plaintiff's tankage falls within the regulatory definition of "breakout tanks" because there is no question plaintiff receives and stores hazardous liquid transported by a pipeline for reinjection and continued transportation by pipeline. Consequently under the *Chevron* analysis, and based on the undisputed facts presented in this case, defendant did not exceed either its statutory or regulatory authority in directing plaintiff to comply with DOT pipeline safety regulations.[7]

### IT IS HEREBY ORDERED:

1) Defendant's Motion for Summary Judgment (Ct. Rec. 1 2) is **GRANTED.**

2) Plaintiff's Motion for Summary Judgment (Ct.Rec.16) is **DENIED.**

3) Plaintiff's complaint is **DISMISSED** with prejudice.

4) Defendant's Motion to Withdraw Counterclaim (Ct.Rec.28) is **GRANTED.**

5) Defendant's counterclaim is **DISMISSED** with prejudice.

6) Defendant's Motion to Supplement Administrative Record (Ct.Rec.25) is **GRANTED.**

**IT IS SO ORDERED.** The Clerk of the Court shall enter judgment accordingly and shall forward copies of the judgment and this order to counsel.

---

7. If Exxon were to stop reinjecting product into the pipeline, then arguably it would not be subject to DOT's regulatory authority, although it might still be subject to the statutory authority. In that case, there could conceivably be due process issues (i.e. inadequate notice of what DOT intends to regulate; arbitrary and capricious determination of what it intends to regulate).

Exxon speculates DOT is also asserting statutory authority over tankage which is not connected to the pipeline. That is not an issue in this case because it is undisputed the tanks are connected to the pipeline. Nonetheless, in a different scenario, DOT might argue that bulk storage tankage, not connected to a pipeline, is "incidental" to pipeline transportation if it is merely located near a pipeline. In that scenario, it may be unclear whether the term "incidental" would apply (i.e. the term may be ambiguous). Clearly, such tankage would not qualify as "breakout" tankage under 49 C.F.R. § 195.2.

## ORDER GRANTING PERMISSION TO APPEAR PRO HAC VICE AS COUNSEL FOR DEFENDANT, SECRETARY OF TRANSPORTATION

This matter is before the Court on motion of Defendant, United States Secretary of Transportation, through his counsel, James P. Connelly and Pamela DeRusha, for the admission pro hac vice of Angel Collaku as counsel for Defendant, United States Secretary of Transportation.

The Court having reviewed the motion filed herein, the accompanying affidavit of Angel Collaku, and the records and file herein, the Court having found that good cause for granting the motion has been shown.

IT IS HEREBY ORDERED, that Angel Collaku be admitted pro hac vice as counsel for Defendant, United States Secretary of Transportation in this case.