IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 5, 2009 Session

## RICHARD A. DEMONBREUN v. METROPOLITAN BOARD OF ZONING APPEALS

Appeal from the Circuit Court for Davidson County
No. 08C-3867     Joseph P. Binkley, Jr., Judge

No. M2009-00557-COA-R3-CV - Filed June 10, 2011

The Metropolitan Nashville Board of Zoning Appeals refused to grant a special exception permit to allow a Nashville businessman to operate a Historic Home Events business in a residential neighborhood.  The Board stated that its decision was based on the businessman's history of non-compliance with the conditions it had imposed on earlier permit grants and renewals.  The businessman filed a petition for writ of certiorari in the Circuit Court of Davidson County.  After a hearing, the court found that four of the BZA members had acted out of ulterior motives, *i.e.*,their displeasure and frustration with the applicant, and it granted the requested permit, subject to a number of restrictions.  We hold that the BZA may take into consideration prior activity at the location in the context of the impact of those activities on the public health, safety, and welfare.  Because herein the BZA did not relate any specific prior conduct to a public harm and because most of the activities discussed at the hearing had occurred prior to previous permit grants and renewals, we conclude that the denial was arbitrary.  Accordingly, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

PATRICIA J. COTTRELL, P.J.,M.S., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Sue B. Cain, Director of Law, The Department of Law of the Metropolitan Government of Nashville and Davidson County, J. Brooks Fox, Christopher Michael Lackey, Elizabeth Anne Sanders, for the appellant, Metropolitan Board of Zoning Appeals.

Richard A. Demonbreun, Nashville, Tennessee, Pro Se.

# OPINION

## I. BACKGROUND

Richard Demonbreun bought a large home located at 746 Benton Avenue in Nashville's historic Woodland-in-Waverly neighborhood. He renovated the home at considerable expense, with the intention of establishing a bed and breakfast and using the home to host special events like weddings and conferences. He named it the Timothy Demonbreun House to honor his great-great-great-great grandfather, one of the founders of Nashville.

In 1999, Mr. Demonbreun petitioned the Board of Zoning Appeals ("BZA") for a special exception permit to use the property as a "Historic Homes Events" site, which would allow him to legally operate his planned business. The BZA granted the permit, subject to eight conditions, which were related to traffic and noise, as well as to limitations on the frequency, size and hours of events hosted at the site. The duration of the permit was one year, to give the BZA the opportunity to review the permit and see how the conditions were working.

In 2000, the BZA again granted Mr. Demonbreun a permit, subject to the same conditions and expiration period. When Mr. Demonbreun filed his third permit application in 2001, however, some nearby residents objected, complaining that his failure to comply with some of the conditions set out in the earlier permits disturbed their peace and quiet. After hearing those complaints, the BZA denied the permit.

In accordance with the rules of the BZA, the landowner reapplied for the permit six months after the denial. The BZA conducted an extensive hearing on the new application, during which both supporters and opponents of the permit expressed their views. The Board then voted to grant the permit, "for a period of time not to exceed one year" and subject to a set of similar conditions to those previously imposed.

Mr. Demonbreun filed a petition for writ of certiorari in the Circuit Court of Davidson County, challenging the time limitation on the permit and other conditions imposed on the operation of his business. The trial court found that the time limit and most of the challenged conditions were not supported by material evidence and removed them from the permit.

The BZA then appealed to this court, contending that there was ample evidence to support all the conditions that it had imposed on the permit. We found that the one-year limitation on the permit was supported by material evidence in the record, as were all but two of the conditions imposed by the BZA. Our opinion affirming the trial court in part and

reversing it in part is found at *Demonbreun v. Metro Bd of Zoning Appeals,* 206 S.W.3d 42 (Tenn. Ct. App. 2005).

## II. CURRENT PROCEEDINGS

Mr. Demonbreun apparently received several subsequent annual permit approvals, including one which was granted in 2006.[1] He did not apply for or receive a renewal of his permit in 2007, because he had signed a contract to sell his residence and his business to Ms. Ann Coleman. Ms. Coleman herself applied for a permit, which the BZA granted on May 31, 2007, "for a period of time not to exceed one year." The permit included conditions similar to those imposed on Mr. Demonbreun.

Ms. Coleman operated the business under the new permit for about six months. Unfortunately, and unbeknownst to the BZA, she had not closed on the purchase of the property at the time her permit was granted. She ultimately backed out of the transaction when she was unable to obtain sufficient financing to complete the purchase. Mr. Demonbreun then applied for a new permit in his own name.

The BZA conducted a public hearing on March 20, 2008. Five board members were present. They voted 2-1 to deny Mr. Demonbreun's application for a special exception permit, with two members abstaining. The Board accordingly issued an initial order denying the application. The Board met in executive session on April 3 and April 17, 2008, after which it issued a final order denying the application by operation of law because the applicant did not get four affirmative votes within thirty days of the hearing, as is required by the BZA's rules of procedure.

Mr. Demonbreun filed another permit application within six months. In the interim, neighbors filed two complaints against him in General Sessions Court for holding events on his premises even though he no longer possessed a valid permit. The court found him guilty of both violations, and fined him $50 for each one.

The BZA conducted a public meeting on November 20, 2008, which included a hearing on Mr. Demonbreun's most recent application. His case was the last one heard on a docket of five cases. The BZA gave the proponents and the opponents of the application a total of 15 minutes each to express their views. The time limits were strictly adhered to. Mr. Demonbreun was the first to speak. He asserted that over the years he had conducted over 340 events on his premises, and that he was guilty of only a few isolated or inadvertent violations of the conditions imposed on his special exception permits.

---

[1]In his complaint, he recites that he applied for and received five permits beginning in 2000.

One violation was the erection of tent on his front lawn for a November 2001 wedding. Another violation occurred when a tour bus for the band Alabama drove down Benton Avenue in July of 2002, despite the no-tour bus restriction on Mr. Demonbreun's permit. He claimed that he was unaware that the bus was coming and that he immediately came out into the street and told the bus to leave the neighborhood. In December of 2005, Mr. Demonbreun hosted a small wedding for a bride with a limited budget. He stated that he allowed the waiver of the valet parking requirement of such events because "I have a soft heart," and that he himself parked thirteen cars on his curb and in his driveway.

As for the two gatherings he had hosted which led to complaints in General Sessions Court, Mr. Demonbreun admitted that he allowed out-of-town relatives of a senior graduating from a local high school to use the house on May 19, 2008 for a family gathering prior to their departure for the graduation ceremony. He stated that because of the gathering one of the neighbors called the police, but that by the time the police had arrived, his guests had gone. He also admitted that he rented some rooms in the house to a marketing company on August 4, 2008 for a lengthy indoor meeting or a retreat, which involved about twelve people.[2]

Mr. Demonbreun complained that a few neighbors in particular were determined to drive him out of the neighborhood for reasons of their own, and were prepared to pounce on any perceived irregularity in his operation to accomplish their purpose. In particular, he alleged that William S. Cochrane, Jr., who lived directly across the street from Mr. Demonbreun, was determined to drive him out of business because he operated a competing bed and breakfast in another county, and that Mr. Cochrane had gone so far as to try to sabotage a wedding in progress.

In his own presentation to the Board, Mr. Cochrane cited the same violations that Mr. Demonbreun had mentioned, as well as a 2006 incident in which Mr. Demonbreun used amplified music outdoors in alleged violation of another restriction.[3]

It was apparent from the comments made by opponents of his application that Mr. Demonbreun had alienated many of his neighbors, who regarded him as pushy and aggressive. Several neighbors said that they did not object to having a special events location

_____

[2] Mr. Demonbreun stated that he needed money to pay his bills, and that the businessmen paid for three guest rooms but did not stay overnight, and instead used the common areas of the house for their meeting.

[3] Mr. Demonbreun admitted during questioning that he used an 8 inch speaker in the breezeway of his house for one 2006 wedding. He claimed that he didn't realize that the prohibition in his permit against the use of amplified music outdoors was meant to be so strictly construed.

in their neighborhood, but only to his role in it. One neighbor stated that "he seems to think that the rules don't apply to him," and she complained that "he's made promises to have Easter egg hunts, to have computer rooms for kids, and never fulfills his promise to give a donation to the neighborhood association." Even one neighbor who spoke in favor of granting the application stated that, "Mr. Demonbreun is a pretty intense guy . . . when something means a lot to him, he tends to push the envelope."

Mr. Demonbreun and his opponents both submitted packets of documents to the BZA. Mr. Demonbreun's packet included a petition in support of allowing the continuing operation of his business subject to a list of limitations he himself had drafted. His petition contained the signatures of 111 neighborhood residents. He also included two letters to substantiate his allegation that Mr. Cochrane was deliberately trying to put him out of business. His opponents submitted a petition with 42 signatures, as well as court documents relating to the earlier complaints against him.

At the conclusion of presentations by both sides, the Board members asked questions, most of which were directed towards Mr. Demonbreun, and many of which were hostile in tone. One Board member repeatedly challenged Mr. Demonbreun to explain in what way he had personally changed or had altered his conduct after allegations were raised about his non-compliance with the conditions imposed on an earlier permit. The members seemed especially aggrieved that Mr. Demonbreun was willing to resort to the courts when he did not agree with the actions of the BZA. One member told him, "You have no respect for the decisions of this Board because you simply appeal our decisions."[4]

During deliberations, one board member made a motion for denial of the application, stating that he personally did not think the board should have even had to hear it because, "We hear the same things all the time. And it's just kind of a repeat of what we've heard before." After further discussion, five board members voted against issuing the special exception permit, and one board member abstained. The Board's order, issued on December 1, 2008, stated that the Board found that, "The appellant has not satisfied all of the conditions

---

[4]On appeal, the BZA asserted that its objection was not based on Mr. Demonbreun's exercise of his right to appeal, but because his appeal was filed in the face of assurances he had allegedly given the Board that he had no intention to appeal the conditions they placed on his permit.

of Sections 17.16.150 and 17.16.160B,"[5] and that the permit was denied, "based upon the applicant's history of noncompliance with regulations put on him in the past."

Mr. Demonbreun then filed another petition for writ of certiorari and supersedeas in the Circuit Court of Davidson County. The Circuit Court granted the writ and ordered that the administrative record be sent up for review.[6] The court closely scrutinized the transcript of the hearing of November 20, 2008 and conducted an expedited hearing during which it heard arguments from both sides. The court reversed the BZA's action in an order dated March 3, 2009.

The court's order quoted a number of the negative comments directed towards Mr. Demonbreun during the BZA hearing by four of the five members who had voted to deny the permit, and concluded that the BZA had acted arbitrarily by "basing a decision on ulterior motives." The court recited that:

> Those four board members' ulterior motives stem from the fact that the Petitioner has appealed their decisions in the past and that Mr. Demonbreun has frequently appeared before the Board regarding a special exception permit. Those Board members allegedly denied the Petitioner's application in this case because of some minor, past violations, but the real motive for the Board's ultimate decision in this case is their clear dislike of the Petitioner as evidenced by the above referenced statements, comments and questions by four of the board members.

The trial court noted that the normal judicial remedy under the common law writ of certiorari for error discovered in the proceedings being reviewed is to remand the case to the agency below for reconsideration of its action in light of the court's findings. The court

---

[5] Section 17.16.150 of the Metropolitan Code of Laws ("M.C.L") sets out the general provisions for the grant of a special exception permit. Its subsections A-J deal respectively with Burden of Proof, Ordinance Compliance, Integrity of Adjacent Areas, Design and Architectural Compatibility, Natural Features, Historic Preservation, Traffic Impact, Hazard Protection, and Special Conditions. The BZA did not specify which of these provisions Mr. Demonbreun failed to satisfy.

M.C.L. 17.16.160(B) sets out the provisions for the grant of a Historic Homes Events special exception permit. Its subsections 1-7 deal respectively with Lot Size, Location, Parking, Signs, Meals, the requirement that the home be Owner-Occupied, and the BZA's right to "limit the number and frequency of events to minimize disturbance to surrounding properties." The BZA also did not specify which of these provisions Mr. Demonbreun failed to satisfy.

[6] Judge Gayden issued the writ, but subsequently recused himself. The case was transferred to Judge Binkley, who conducted the hearing on the writ and rendered the order that is the subject of this appeal.

found, however, that because of the ulterior motives of the Board members, this case involved "extraordinary circumstances," that required it to simply order the BZA to grant Mr. Demonbreun the special exception permit. It declared that the permit would be effective for a period of eighteen months, and it set out limitations and restrictions which were similar to (but not identical with) those which the BZA had placed on Ms. Coleman's permit.[7] The BZA then filed a motion to stay the trial court's order, which was denied. This appeal followed.

---

[7]The limitations and restrictions ordered by the trial court are the same as those that were set out in Mr. Demonbreun's permit application and petition, with the exception that Mr. Demonbreun's version of item (a) below stated that the permit was subject to revocation, while the court's order stated that it was subject to renewal, and item (e) below, relating to a New Year's Eve schedule was not included in Mr. Demonbreun's original documents.

The list in the trial court's order reads as follows:

a. Permit for applicant only to expire in eighteen months subject to renewal;
b. All events must be held inside, no outside amplified music, guests may use front/side porches and side patio behind rear privacy fence;
c. Only one event to occur each day, no events on Sunday;
d. Weekday events on Monday through Thursday to end no later than 9:30 p.m.; Friday/Saturday events to end no later than 10:30 p.m.; valet services must be completed no later than 30 minutes of event conclusion;
e. Any event held on New Year's Eve may end as late as midnight with all cleanup and valet services being completed no later than 12:30 a.m. on January 1.
f. Only two large events each week over 40 guests, none larger than 75 guests;
g. Valet parking required for events of more than 15 cars, and additional cars must be valet parking rented lots off site on 8th Avenue;
h. No tents, large tour buses or horse carriages permitted;
i. No adjacent property may be used for any event.
j. At least one week advanced public notice of all scheduled events including customer's name, phone number, date, time, size and description to be posted on "District 17 and "Woodland in Waverly" Google Groups web page for independent verification.

## III.  THE STANDARD OF REVIEW

Judicial review of a decision by a local board of zoning appeals is obtained by filing a petition for a common law writ of certiorari.[8]  Tenn. Code Ann. § 27-8-101; *Harding Academy v. Metro Gov't of Nashville*, 222 S.W.3d 359, 363 (Tenn. 2007); *McCallen v. City of Memphis,* 786 S.W.2d 633, 639 (Tenn. 1990); *Fallin v. Knox County Bd. of Commissioners*, 656 S.W.2d 338, 342 (Tenn. 1983).

The scope of review under a common law writ of certiorari is very narrow.  It does not involve an inquiry into the intrinsic correctness of the decision of the tribunal below, but only as to whether that tribunal has exceeded its jurisdiction, or acted illegally, fraudulently or arbitrarily.  *McCallen v. City of Memphis*, 786 S.W.2d at 638; *Hutcherson v. Lauderdale County Bd. of Zoning Appeals,* 121 S.W.3d 372, 375 (Tenn. Ct. App. 2003).

> In proceedings involving a common law writ of certiorari, illegal, arbitrary, or fraudulent actions include: 1) the failure to follow minimum standards of due process; 2) the misrepresentation or misapplication of a legal standard; 3) basing a decision on ulterior motives; and 4) violating applicable constitutional standards.

*Harding Academy v. the Metropolitan Government of Nashville and Davidson County*, 222 S.W.3d 350, 363 (Tenn. 2007) (citing *Hoover, Inc. v. Metro Bd. of Zoning Appeals,* 924 S.W.2d 900, 905 (Tenn. Ct. App. 1996)).  The trial court concluded in this case that the BZA had based its decision on ulterior motives, and thus had arbitrarily denied Mr. Demonbreun's application.  In this situation, "ulterior motives" simply means the decision was based on something other than the evidence presented as applied to governing legal principles.

---

[8]An action by the zoning board is reviewed by common law writ of certiorari because it is administrative rather than legislative in nature. *Weaver v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 783-84 (Tenn. Ct. App. 2003). "We wish to point out, however, that the remedy of certiorari provided by T.C.A. §§ 27-8-101, 27-9-101-27-9-113 will continue to be the proper remedy for one who seeks to overturn the determination by Board of Zoning Appeals as provided by T.C.A. § 13-7-106 et seq. and T.C.A. § 13-7-205 et seq. This distinction in remedies is made because the determinations made by a Board of Zoning Appeals are administrative determinations, judicial or quasi-judicial in nature, and are accompanied by a record of the evidence produced and the proceedings had in a particular case, whereas, the enactment of ordinances or resolutions, creating or amending zoning regulations, is a legislative, rather than an administrative, action and is not ordinarily accompanied by a record of the evidence, as is the case of an administrative hearing." *Fallin v. Knox County Bd. of Com's*, 656 S.W.2d at 342-43.

Our review of the evidence on appeal can be no broader or more comprehensive than the trial court's review. *Watts v. Civil Serv. Bd. for Columbia,* 606 S.W.2d 274, 277 (Tenn. 1980); *Jacks v. City of Millington Bd. of Zoning Appeals*, 298 S.W.3d 163, 167 (Tenn. Ct. App. 2009). Application of a statute or ordinance to the facts is a question of law that is properly addressed to the courts. *Sanifill of Tenn., Inc. v. Tennessee Solid Waste Disposal Control Bd.*, 907 S.W.2d 807, 810 (Tenn. 1995). As to issues of law, our review is *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d); *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

In this case, the BZA stated it was denying the permit renewal "based upon the applicant's history of noncompliance with regulations put on him in the past." The trial court, however, found that the administrative record revealed a different reason or basis for the denial. The court found that "The real motive for the Board's ultimate decision in this case is their clear dislike of the Petitioner," as evidenced by Board members' statements, comments, and questions relating to Mr. Demonbreun's appeals of the Board's earlier decisions.

## IV. SPECIAL EXCEPTIONS AND THE BOARD OF ZONING APPEALS

In analyzing the issues presented in this appeal, it is important to keep in mind the context of the decision under review: specifically, that it involved the denial of a permit pursuant to a special exception.

A special exception,[9] unlike a variance, is not an exception to a zoning ordinance. Instead, it is a use that is expressly permitted.

> "Special exception" is clearly a misnomer. Since **the use is specifically provided for in the ordinance as one to be permitted** where the conditions legislatively prescribed are found, no exception to the ordinance is being made. The use permitted by approval of the board of adjustment, the legislative body, the planning board, or the "zoning administrator," as the case may be, **contingent on meeting the standards and conditions set forth in the ordinance**, is more correctly termed a "conditional use." This is, in fact, the term which is used in some statutes.

---

[9]The term itself is somewhat misleading. "The term 'special exception' is a carryover from the early days of zoning; the term 'special permit' goes even farther back, being found in regulatory ordinances prior to zoning. Because the early zoning ordinances adopted these terms, the courts ruling upon such provisions necessarily used the language of the ordinances before them which perpetuated the use of these terms. 3 Rathkopf's THE LAW OF ZONING AND PLANNING § 61:9 (4th ed.).

3 Rathkopf's THE LAW OF ZONING AND PLANNING § 61:9 (4th ed.) (emphasis added).

> The essential difference between a special exception use and a variance is that a variance is an authority to a property owner to use this property in a manner forbidden by the ordinance, **while a special exception allows him to put his property to a use which the ordinance expressly permits.** This distinction between a use variance, which depends upon a finding of the existence of unnecessary hardship in the application of the ordinance to a particular piece of property by reason of conditions unique to that property, and an exception, which requires no such finding, but only **a finding that the conditions stated in the ordinance have been met,** further emphasizes the nature of a special exception or conditional use. The inclusion of the particular use in the ordinance as one that is permitted under certain conditions, is equivalent to a **legislative finding that the prescribed use is one which is in harmony with the other uses permitted in the district, and while a variance can be granted only with respect to particular property as to which unnecessary hardship is found, the special exception permit must be granted to any and all property that meets the conditions specified.**

3 Rathkopf's THE LAW OF ZONING AND PLANNING § 61:11 (4th ed.) (emphasis added).

Thus, it is well established that a special exception to a local zoning ordinance refers to uses that are specifically allowed by the ordinance in certain areas or zones within the locality. The local legislative body has determined that such uses are not incompatible with basic uses in zone involved, but not without restriction or conditions being imposed on such use. Thus, a special exception allows a property owner to put his property to a use which a zoning ordinance expressly permits under conditions specified in zoning regulations themselves. *Twin County Recycling Corp. v. Yevoli*, 688 N.E.2d 501 (N.Y. Ct. App. 1997); *Stacy v. Montgomery County*, 210 A.2d 540 (Md. 1965); BLACK'S LAW DICTIONARY at 1253 (5th ed. 1979).

Where the legislative body has authorized a use by special exception or conditional use, courts will presume that such use serves the public interest when located in the district where it is authorized. 2 Am. Law, Zoning § 14.12 (5th ed.). Classification of a use as one that is permitted as a special exception constitutes a legislative finding that the use accords with the general zoning plan, is in harmony with, or will not adversely affect, the surrounding neighborhood, and meets a public need. *Robert Lee Realty Co. v. Village of Spring Valley*, 61 N.Y.2d 892, 474 N.Y.S.2d 475, 462 N.E.2d 1193 (1984); *Dan Gernatt Gravel Products, Inc. v. Town of Collins*, 105 A.D.2d 1057, 482 N.Y.S.2d 587 (4th Dep't 1984); *Kristensen*

*v. City of Eugene Planning Commission*, 24 Or. App. 131, 544 P.2d 591 (1976); *Brentwood Borough v. Cooper*, 60 Pa. Commw. 462, 431 A.2d 1177 (1981).

Tennessee law follows these generally applicable principles. In fact, state statutes recognize the difference between a variance and a use permitted under certain conditions. Tennessee Code Annotated § 13-7-207 sets out the powers of boards of zoning appeals.[10] Subsection (3) authorizes such boards to grant a variance from strict application of zoning regulations where exceptional difficulties to, or undue hardship upon, the property owner would otherwise result. On the other hand, subsection (2) authorizes a board of zoning appeals to "[h]ear and decide, in accordance with the provisions of any such ordinance, requests for special exceptions." Tenn. Code Ann. § 13-7-207(2).

Mr. Demonbreun operated under a Historic Home Events special events permit, which is governed by 17.16.160(B) of the Metropolitan Code.[11] That section reads,

B. Historic Home Events

1. Lot Size. The minimum bulk standard for the zone district shall apply.

2. Location. The events shall be within a historically significant structure, as determined by the historic zoning commission.

3. Parking. Where the minimum parking space standard requires additional parking area to be constructed, such area shall comply with the perimeter parking lot landscaping according to Chapter 17.24 of this code. In urban settings, the board of zoning appeals may consider on-street parking to satisfy the minimum parking standard, provided there is a finding of sufficient available public space.

4. Signs. Signs for advertising shall not be permitted.

5. Meals. Meal service shall be restricted to patrons of the special event only, and not to the general public.

---

[10]This set of statutes governs municipal zoning. Tennessee Code Annotated §§ 37-7-101 *et seq.* govern county zoning. Both sets apply to the Metropolitan Government of Nashville and Davidson County.

[11]M.C.L. 17.16.160. sets out provisions for two types of Residential Special Exceptions. Those for a Rural Bed and Breakfast Homestay, found at M.C.L. 17.16.160(A), are not relevant here.

6. Owner Occupied. The owner of the property must reside permanently in the historic home. Where there is more than one owner of the home, or where an estate, corporation, limited partnership or similar entity is the owner, a person with controlling interest, or possessing the largest number of outstanding shares owned by any single individual or corporation shall reside permanently in the historic home. If two or more persons own equal shares that represent the largest ownership, at least one of the persons shall reside permanently in the historic home.

7. Frequency of Events. The board of zoning appeals may limit the number and frequency of events to minimize disturbance to surrounding properties.

Metro has also adopted provisions regarding the authority of the BZA over special exceptions generally, not just Historic Home Events uses. The zoning ordinance of the Metropolitan Code of Laws ("M.C.L.") provides, "A special exception permit shall not be considered an entitlement, and shall be granted by the board of zoning appeals only after the applicant has demonstrated to the satisfaction of the board that **all of the required standards are met.**" M.C.L. 17.16.150(A). Also, "[n]othwithstanding a finding by the board of zoning appeals that a special exception application satisfies the minimum development standards of this article, the board may restrict hours of operation, establish permit expiration dates, require extraordinary setbacks and impose other **reasonable conditions necessary to protect the public health, safety and welfare**." M.C.L. 17.16.150(J). (emphasis added).

This appeal does not involve allegations that Mr. Demonbreun has not met the specific requirements set out in M.C.L. 17.16.160(B). It involves, rather, the scope of the board's discretion to grant or deny a permit in the face of allegations that the holder of a prior permit had not fully complied with conditions imposed by the board as "necessary to protect the public health, safety and welfare."

## V. GROUNDS FOR DENIAL OF A SPECIAL USE PERMIT

The BZA argues on appeal that Mr. Demonbreun's failure to fully comply with the limitations it placed on his earlier-granted special exception permits is sufficient justification for refusing to grant his most recent application. On the other hand, Mr. Demonbreun argues that the BZA cannot deny him a permit for past non-compliance because that is not one of the conditions set out in M.C.L. 17.16.160(B), and the BZA has no authority except that vested in it by city ordinance or other law. *See State v. City of Oak Hill*, 321 S.W.2d 557, 558 (Tenn. 1959).

The basic principles regarding the discretion of a board of zoning appeals[12] in dealing with special exception applications are well settled:

> A board of adjustment may grant or deny a special permit solely on the basis of the statutory authority delegated by the zoning ordinance or by statute and subject to the limitations imposed thereby. It is without power to grant a special permit not expressly authorized by the zoning ordinance; **it is equally without power to deny a permit on grounds not expressly stated in the ordinance.**

3 ANDERSON'S AMERICAN LAW OF ZONING § 21.19 (Kenneth H. Young, ed., 4th ed. 1996) (emphasis added).

The principle set out in the emphasized part of that quotation is well-settled and is generally accepted as the law to be applied in reviewing BZA decisions on conditional uses or special exceptions. "Where a use is authorized upon issuance of a special permit subject to specified standards, . . . [u]pon proof of compliance with the standards, a denial usually will not be sustained unless proof of a public detriment is adduced. 2 AM. LAW, *Zoning* § 14.12 (5th ed.). "A county planning board is **without power** to deny a special use permit on grounds **not expressly stated** in the zoning ordinance, and it must employ the specific statutory criteria which are relevant." 101A C. J. S. *Zoning and Land Planning*, § 258 (2011) (emphasis added).

> Certain grounds have been held by the courts as being insufficient to justify a denial of an application for a permit. A planning board may always take evidence and testimony from community members into account in making its permitting decisions, but it may not rely on neighborhood opposition alone as a reason to deny a permit.

101A C. J. S. *Zoning and Land Planning*, § 258 (2011).

This well-settled general principle is totally consistent with a number of Tennessee cases considering the scope of the authority of a board of zoning appeals when dealing with special exceptions. As we said in *Wilson County Youth Emergency Shelter v. Wilson County,* 13 S.W.3d 338 (Tenn. Ct. App. 1999), "[w]hile the BZA has authority to act under the zoning regulations, it must act 'within existing standards and guidelines.' It clearly does not have

---

[12]The treatise refers to a "board of adjustment" rather than a "board of zoning appeals," but its description of the function and powers of such a board, and its numerous references to cases involving boards of zoning appeals, demonstrate that there is no meaningful distinction between the differently denominated bodies.

unbridled authority to deny an otherwise fully-compliant request simply because other citizens are opposed to the use" 13 S.W.3d. at 343 (quoting *McCallen v. City of Memphis,* 786 S.W.2d at 639). *See also Father Ryan High School v. City of Oak Hill*, 774 S.W.2d 184, 190 (Tenn. Ct. App. 1989).

The relevant portion of the Metro Code provides that a special exception permit shall be granted by the BZA "only after the applicant has demonstrated to the satisfaction of the board that **all of the required standards are met.**" M.C.L. 17.16.150(A). Mr. Demonbreun argues that absolute compliance with all conditions of a prior grant of special use permit is not one of the required standards; it is not included in the requirements set out in the ordinance. There is no dispute that the relevant ordinances do not contain specific language listing compliance with prior conditions established by the BZA as a requirement for a special exception permit.

He relies in part on this court's decision in *Hutcherson v. Lauderdale County Board of Zoning Appeals,* 121 S.W.3d 372 (Tenn. Ct. App. 2003). In that case, the county board was confronted with an application for a permit to establish a sanitary landfill in a zoning district where such a use was permitted, subject only to the approval of the Tennessee Department of Health. The BZA unanimously rejected the application in response to concerns about the impact on the roads from the increased traffic that the landfill would generate. The trial court affirmed the BZA's determination.

This court reversed. We declared that if an applicant satisfies all the criteria set out in the zoning ordinance, the BZA must grant him a permit. "To do otherwise would vest the BZA with the ability to enact or amend zoning laws, a power not vested in the Board of Zoning Appeals but in a county or municipality's legislative body." *Hutcherson v. Lauderdale County Board of Zoning Appeals,* 121 S.W.3d at 376 (quoting *Domincovitch v. Wilson County Board of Zoning Appeals,* No. M1999-02334-C0A-R3-CV, 2000 WL 1657843 (Tenn. Ct. App. Nov. 6, 2000)) (no Tenn. R. App. P. 11 application filed).

On the other side, Metro argues that the BZA is entitled to consider an applicant's prior history as a permit holder when considering an application for a new permit, citing *Lafferty v. City of Winchester,* 46 S.W.3d 752, 758 (Tenn. Ct. App. 2000), in support of that proposition. In that case, this court affirmed the BZA's denial of a building permit, noting that the Board considered "the track record" of the property owners, and arguably decided on that basis not to approve the application because, "We've been down this road before." *Lafferty*, 46 S.W.3d at 760.

However, the operative facts of that case were somewhat different from those in the case before us. The *Lafferty* case involved an application for a building permit to expand a

bed and breakfast, which did not operate under a special exception permit, but, rather, was grandfathered in as an existing non-conforming use on the plaintiffs' property. Relevant statutes allow an owner of property that qualifies as a non-conforming use to expand business operations or even to reconstruct business premises. It does not, however, allow the owner to change the use of the property from one non-conforming use to some other non-conforming use. 46 S.W.3d at 758.

The Board of Zoning Appeals had previously approved a building permit so the applicants could add a storage building to their bed and breakfast. The Laffertys had instead opened a pub in the purported storage building, which generated many complaints from the neighbors about noise and traffic, particularly in regard to an outdoor patio and gazebo where dances were held. The Board deemed the pub to be a different non-conforming use from a bed and breakfast, and one that was not privileged to operate under the grandfathering statute. The Board rejected the Laffertys' application to build another addition because it concluded that the purpose was not to expand the bed and breakfast, but to bring some of the pub's noisier outdoor activities indoors. Thus, even if the Board disapproved of the Laffertys' conduct, its decision was based on the purpose for which the proposed addition was to be used, rather than on the applicants' conduct. Additionally, the *Lafferty* case did not involve a special or conditional use, but instead expansion of a non-conforming use.[13]

The principles set out above, while relevant, do not specifically address the precise question of whether a board of zoning appeals can deny a special use permit on the basis of the applicant's past violation of conditions imposed on the use. Niether party has provided us such authority, but we have found some. The general rule is:

---

[13]The BZA has also cited a number of cases from other jurisdictions where the appeals court has upheld the right of an administrative body to deny an applicant a permit or license on the basis of the applicant's past conduct. However, we do not find these cases particularly relevant or helpful. They involve other types of licenses and involve specific statutory authority for the actions of the administrative body. For example, in *Wes Ward Enterprises v. Andrews*, 355 N.E.2d 131, 141 (Ill. App. 1976), a licensing board denied an application for a permit to operate a massage parlor pursuant to the licensing ordinance, which specifically permitted the board to deny a license to parties who have been convicted of felonies or sex-related offenses within the previous four years. In *Goodlow v. Louisiana Motor Vehicle Commission*, 836 So.2d 297 (La. Ct. App. 2002), the motor vehicle commission denied an application for an automobile salesman's license and based its decision on its statutory authority to deny a license to an applicant "[o]n satisfactory proof of unfitness of the applicant or the licensee." *Goodlow*, 836 So.2d at 300. *Pincourt et al v. Palmer,* 190 F.2d 390, 392 (3d Circuit 1951) involved an application for a license to sell distilled spirits at wholesale. The licensing authority denied the application, relying on a federal statute which "provides in substance that an application for a basic permit shall be granted unless it is found that the applicant is 'by reason of his business experience, financial standing, or trade connections, not likely to maintain such operations in conformity with Federal law.'" *Pincourt et al v. Palmer,* 190 F.2d At 392.

-15-

> Absent a specific standard authorizing a board to consider such matters, it is beyond the authority of a board [of zoning appeals] to decline to issue a special permit because of a prior violation by the applicant. Thus, the board may not consider the applicant's failure to comply with a previous order as a basis for a present decision. . . . **nor may a special permit be refused solely because the applicant committed isolated and minor violations of the conditions of a previous permit.**

83 Am. Jur. 2d *Zoning and Planning* §902 (2011). (emphasis added). *See also* 3 ANDERSON, AMERICAN LAW ZONING, § 19.24 (1976). (stating same rule).

Some courts have held that it is not appropriate to deny a conditional use or special exception because of instances of an applicant's past noncompliance with zoning requirements. In *In re Carrier*, 582 A.2d 110, 115 (Vt. 1990), opponents of development of a subdivision argued that the applicants for the site plan for the subdivision had previously engaged in land development activities prior to site plan approval in violation of local zoning regulations. *Id*. at 114. The Vermont Supreme Court found there had been some development without required permits and that such development was a violation of applicable legal requirements. However, the court did not agree with the opponents that those violations must result in denial of the applicants' site plan approval. *Id*. at 115.

The court cited to the statutes providing for enforcement of zoning regulations, including authorizing local officers to institute appropriate action to abate an unlawful use. *Id*. at 115. However, the court determined that neither the applicants' prior violations nor any enforcement action against them was before the court; instead, the appeal involved review of a decision to grant approval of a site plan. *Id*. The court held that the opponents' arguments regarding specific actions by the applicants at the site of the proposed subdivision "address the issue of prior, unpermitted development; neither the planning commission nor the court was obligated to reject the site plan on those bases." *Id*. at 115.

In its decision, the Vermont Supreme Court cited *Klein v. Colonial Pipeline Co.*, 462 A.2d 546 (Md. App. 1983). In that case, the board of zoning appeals had denied a pipeline company's application for a conditional use permit and variance to allow for construction of additional storage tanks and related equipment. Among other grounds, the denial was based in part on the applicant's failure to comply fully with conditions imposed on a prior grant of conditional use, which grant had occurred 15 years earlier. The trial court found the board's action based on that justification to be arbitrary and capricious. The appellate court affirmed, stating:

We agree with the trial court that there were other zoning enforcement tools available to the Board and the County to compel compliance with the conditions imposed in 1965, and that the rejection of the pending application because of a failure to comply with the conditions was not appropriate.

It is an improper exercise of the Board's and the Hearing Examiner's function to transform zoning application proceedings into a violation and enforcement process:

> Absent a specific standard authorizing a board to consider such matters, it is beyond the authority of a board of adjustment to decline to issue a special permit because of prior violations by the applicant . . . nor may a special permit be refused because the applicant committed isolated and minor violations of the conditions of a previous permit. *See* 3 Anderson, American Law Zoning, § 19.24 (1976); *see also Dowd v. Board of Appeals of Dover*, 5 Mass. App. 148, 360 N.E.2d 640 (Mass. App.1977); *Pokoik v. Silsdorf*, 40 N.Y.2d 769, 390 N.Y.S.2d 49, 358 N.E.2d 874 (1976); *Bartz v. Board of Adjustment*, 80 Wash.2d 209, 492 P.2d 1374 (1972); *Wyss v. Zoning Board of Review of the City of Warwick*, 99 R.I. 562, 209 A.2d 225 (R.I.1965).

462 A.2d at 554.

We have found one opinion in which a court has held that prior conduct at the same location where an applicant seeks a special exception permit may be evidence that the grant of the exception will involve some hazard to public health, safety, or welfare. *Atlantic Richfield Co. v. City of Franklin Zoning Hearing Bd.*, 465 A.2d 98 (Pa. 1983). In that case, the operators of a gas station wanted to convert the station into an "AM/PM Mini-market with self-service gasoline pumps." *Id.* at 98. Neighbors objected and presented evidence regarding the adverse effects on the area that occurred when the gas station had been allowed to operate 24 hours per day.

The appellate court set out the governing legal principles. First, the applicant for a special exception has the burden of establishing that the proposed use complies with the requirements of the ordinance that authorizes the grant of the special exception. *Id.* at 99. If the applicant meets that burden, which the gas station owners did in *Atlantic Richfield*, then the burden shifts to the opponents to show that the proposed use is detrimental to public health, safety, and welfare. *Id.* at 100.

-17-

Opponents have a heavy burden that requires that they prove, to a high degree of probability, that the proposed use will adversely and abnormally impact on the public interest, and this standard requires more than an, "apprehension of mere possibilities of harm." *Id.* In that case, the neighboring residents testified as to the adverse effects of the gas station when it was previously open 24 hours. Because the opponents presented proof of actual harm to the public welfare, they met their burden, and the court held the board was justified in concluding that the grant of the special exception would constitute a detriment to the public health, safety, and welfare of the community. *Id.* The proof in that case did not address prior violations of conditions on a special exception permit. Rather, it involved conduct or activities that occurred on the site and their actual impact.

We have found no Tennessee cases that address the precise question before us. However, certain basic principles of Tennessee law are relevant to our analysis. First, Tennessee authority is consistent with the general principles regarding special exceptions. Because of the nature of a special exception, *i.e.*, it is a use specifically permitted where the legislatively prescribed conditions exist, a special exception permit must be granted where the application meets those conditions. Complicating the issue here is that some of the conditions were imposed by the BZA, not by ordinance.

Secondly, counties obtain their power to enact zoning ordinances and otherwise regulate the use of land by delegation from the state. *Edwards v. Allen*, 216 S.W.3d 278, 284 (Tenn. 2007); *Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466, 471 (Tenn. 2004). Local governments have no inherent power to regulate the use of private property; their only powers in that area derive from the State through specific statutory delegation. *421 Corporation v. Metropolitan Gov'mt of Nashville and Davidson County*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000). "[L]ocal governments must exercise their delegated power consistently with the delegation statutes." *Id.* Local zoning ordinances, and their application by local boards, must comply with state law, be within the zoning authority granted by state statute, and not infringe upon the general policy of the state. *See Nichols v. Tullahoma Open Door, Inc.*, 640 S.W.2d 13, 18 (Tenn. Ct. App. 1982).

Another set of principles also applies. In this case, because it had no other legal basis for denying Mr. Demonbreun a special exception permit, we must assume that the BZA determined that his application did not meet the requirements of the governing ordinance.[14] To reach this determination, the BZA necessarily interpreted and applied the ordinances regarding special exception permits and Historic Home Events. In our review of the Board's

_____

[14]That begs the question of whether the BZA could lawfully establish previous compliance with all prior conditions that may have been imposed as a condition for the grant of a permit.

interpretation and application, we must consider certain rules for construing zoning ordinances.

Zoning ordinances must be construed and applied "with some deference toward a property owner's right to the free use of his or her property." *Lions Head Homeowners' Ass'n v. Metro. Bd. of Zoning Appeals*, 968 S.W.2d 296, 301 (Tenn. Ct. App. 1997). Courts will seek to interpret a zoning ordinance in a way that is "most consistent with the ordinance's general purposes," but any ambiguity will be resolved "in favor of the property owner's right to the unrestricted use of his or her property." *421 Corporation*, 36 S.W.3d at 475. Stated more forcefully, it has been held that because zoning ordinances are an attempt to limit the use of land by a property owner, they are in derogation of the common law, and, therefore, are to be strictly construed in favor of the property owner. *See Rogers Group, Inc. v. County of Franklin*, No. 01A01-9110-CH-00378, 1992 WL 85805 at *8 (Tenn. Ct. App. Apr. 29, 1992) (no Tenn.R.App.P. 11 application filed); *see also Red Acres Improvement Club, Inc. v. Burkhalter*, 241 S.W.2d 921, 923 (Tenn. 1951); *Anderson County v. Remote Landfill Services, Inc.*, 833 S.W.2d 903, 909 (Tenn. Ct. App. 1991);

With regard to the specific issue herein, the enabling legislation authorizes boards of zoning appeals to decide requests for special exceptions in **accordance with the provisions of governing ordinances**. Tenn. Code Ann. § 13-7-207(2). The relevant ordinance provides that a special exception permit shall be granted by the BZA "only after the applicant has demonstrated to the satisfaction of the board that all of the required standards are met." M.C.L. 17.16.150(A). The question is whether compliance with conditions previously imposed by the BZA as part of the grant of a special exception permit is, or can be considered, a "required standard."

As explained above, some courts have taken the position that proceedings on an application for special exception should not be used as an enforcement mechanism. One court has gone so far as to hold that it is an improper exercise of a board's authority to transform zoning application proceedings into a violation and enforcement process. *Klein v. Colonial Pipeline Co.*, 462 A.2d at 554. This court has voiced a similar approach, stating that the BZA has no authority to reject a permit on the ground that it believes that the applicant might in the future "embark upon activities in excess of those activities that are allowed by the zoning ordinance. Ample means exist for zoning authorities to enforce the ordinance to the end that future activities conform to such activities as are allowed . . . ." *Harding Academy*, 207 S.W.3d at 288.

In the *Harding Academy* case, the BZA denied a permit based on what it thought the applicant intended to do on the property based upon prior applications to it, not upon prior violations of zoning regulations or conditions. In addition, the BZA added a condition to the

requirements for the permit requested, and this court determined that it exceeded its authority because a board of zoning appeals "has neither the power to zone nor to amend the zoning ordinance. That power is in the county legislative body." 207 S.W.3d at 288 (quoting *Merritt v. Wilson Co. Bd. of Zoning Appeals*, 656 S.W.2d. 846, 854 (Tenn. Ct. App. 1983)).

We agree that Metro has other means of enforcing violations of the zoning ordinance or of the conditions imposed by the Board. The General Assembly has delegated to local officials the authority to apply and enforce zoning ordinances. *See e.g.*, Tenn.Code Ann. § 13-7-109 (establishing the powers of county boards of zoning appeals); § 13-7-110 (providing for county building commissioner and for the enforcement of zoning regulations through the withholding of building permits); and § 13-7-111 (describing modes of enforcement and penalties for violation).

We also agree that BZA review of applications for special exception permits should not be routinely used as a method of enforcement of zoning regulations that is alternative to the methods specifically set out in, and delegated by, state statute. However, we cannot conclude that a board of zoning appeals that has established lawful conditions[15] for a special exception must ignore all prior conduct on the property when considering issuance of a renewal permit. Otherwise, the power or duty to establish such conditions could be rendered meaningless.

This court, in *dicta* in our prior opinion in the controversy between these parties, has indicated the same position. In analyzing the validity of each restriction placed by the BZA on the operation of the facility, we discussed the one-year duration of the permit and stated that the BZA had an interest in ascertaining whether a permit holder is abiding by its standards and conditions. The court further stated that nothing in the applicable zoning law precluded the BZA's establishment of a permit expiration date solely for the purpose of review and

---

[15]In our prior opinion, we examined the validity of the conditions imposed. That opinion did not directly address the question of whether some of the conditions established by the BZA constitute an exercise of legislative function. It is well-settled that a BZA cannot amend a zoning ordinance. The specific ordinance on Historic Home Events states that the BZA can limit frequency of events, but does not address other areas. The general section on special uses states that the board may restrict hours of operation, establish permit expiration dates, require extraordinary setbacks and impose other reasonable conditions necessary to protect the public health, safety and welfare. Because the issues of whether the conditions imposed by the BZA exceed its authority, or whether the ordinance allowing such conditions is an unauthorized delegation of legislative power, have not been raised, we need not address them. Additionally, we have resolved this appeal without considering those issues.

enforcement purposes[16] and concluded that "[i]n light of the landowner's documented history of noncompliance and the continued complaints by neighboring residents, the BZA could reasonably conclude that a review of the permit within twelve months was necessary and appropriate." *Demonbreun v. Metropolitan Bd. of Zoning Appeals*, 206 S.W.3d at 49.

Obviously, this language implies that the BZA has authority to deny a permit renewal on the basis of the landowner's noncompliance with restrictions imposed by the BZA as a condition of the permit. That was not the actual issue before the court in that appeal, and we are not inclined to adopt that language as dispositive of the question before us. However, we also decline to hold that a board of zoning appeals cannot consider past activities or conduct at the location when considering whether to issue a new or renewal permit. We will not presume that the drafters of the ordinance authorizing the BZA to set conditions on special exception permits intended that exercise to be an empty one.

The initial grant of a permit, and the conditions allowed as to that permit, are governed by considerations of public welfare. Metro ordinance gives the BZA the authority to limit the frequency of the events as part of approving a special exception for a Historic Home Event facility "to minimize disturbance to surrounding properties." The ordinance itself establishes certain conditions relating to type of structure, parking, signage, etc. The ordinance on special exceptions allows the BZA to "impose other reasonable conditions necessary to protect the public health, safety and welfare." It seems to us that these concerns and considerations remain relevant to a renewal of a special exception permit.

Therefore, although a BZA may consider past activities at a location that has enjoyed the use of a special exception permit, there should be some limitations on the BZA's discretion. Since the relevant ordinance governing special exceptions does not list compliance with all previously-imposed conditions as a requirement of approval, any authority of the BZA to consider failure to comply with conditions must be implied. We think that implication must arise from its authority to consider public health, safety, and welfare in its grant of special

---

[16]We do not agree that permit duration can be set "solely" for enforcement purposes. There already exist statutory remedies for violations. Instead, we believe the duration should relate to the BZA's ability to determine whether the use of the property under the special exception permit with conditions has been detrimental to the public health, safety or welfare or whether, for instance, additional conditions or less restrictive conditions are appropriate in view of actual use for some period of time. In other words, we think the duration discretion given to the board should be applied to examining the use, not the applicant. That distinction highlights one of the difficulties presented by this case: trying to apply concepts usually associated with individual licensing to issues of land use. Zoning regulation concerns itself with how real property is used, not with who is using it. While it is somewhat common in licensing cases for the licensing authority to consider prior conduct by the applicant, usually pursuant to specific statutory authority or direction, those issues are generally not relevant to zoning decisions. Additionally, in the usual case, once a use is approved under zoning ordinances, the property retains that zoning without any necessity of revisiting that determination periodically.

exceptions and its design of conditions for such grants. In other words, it is not any violation of prior conditions, *per se*, that may result in denial of a permit. Rather, in its consideration of an application for a renewal permit, the BZA may take into account activities carried on at the location, which may include violations of conditions, and the impact of those activities on the public health, safety, and welfare.

Additionally, in its consideration, the BZA must keep in mind that the particular use requested has been determined by the legislative body to be compatible with the area which is zoned for a special exception use. Some courts have held that to be sufficient to justify denial, any alleged adverse impact of a proposed special exception must be unique to the particular neighborhood and different from the effect that would otherwise result from the same use anywhere in the zone. *See* 168 A.L.R. 13 (2011); *C.R.M. Corkle, ANNOTATION CONSTRUCTION AND APPLICATION OF PROVISIONS FOR VARIATION IN APPLICATION OF ZONING REGULATIONS AND SPECIAL EXCEPTIONS.*

The concept of proportionality is also relevant. A BZA's denial of a special exception permit, especially where there have been previous grants, has the result of denying a property owner free use of his or her property and, in many cases, means the end of a business or livelihood. Consequently, minor, infrequent, technical, or unintentional violations of conditions will generally not be sufficient to sustain a denial of a renewal permit. Remedies available through judicial enforcement allow for other sanctions short of revocation or denial of a permit.

Special use approval is a function of land use regulation. Consequently, the primary focus in any permit decision must be the use itself. If the BZA chooses to rely on past violations of previously imposed conditions, it must do so in the context of activities at the location and their impact on public health, safety and welfare. And, in exercising its authority in this area, the BZA must be specific as to the conduct or activities it considers justify a denial, and that conduct or those activities must be shown to be or to have been harmful to the health, safety, or welfare of the citizens in the area.

## VI. THE BZA DENIAL HEREIN

Applying the standards outlined above, the BZA's denial of the special exception permit herein cannot be sustained. The BZA stated that it denied the permit "based upon the applicant's history of noncompliance with regulations put on him in the past." This statement makes clear that the denial focused on the applicant, not on the property's use. It also refers

only to noncompliance with prior conditions, not to activities on the property and their impact on the welfare of the neighboring residents.[17]

Additionally, the stated reason is very general and vague. It did not specify the violations that the BZA found justified the denial, nor did it reveal when those violations occurred or why the BZA found them so serious or harmful to the surrounding area. Action based upon the BZA's authority to protect public welfare, when applied to a use that is permitted in the zone, requires specificity as to the conduct or incidents deemed harmful when that action is denial of a permit.

The record shows that Mr. Demonbreun applied for and received a succession of special exception permits, each of which was issued with conditions attached. Some of his neighbors objected almost every time he applied for a new permit or for a permit renewal, complaining about his alleged failures to comply with those conditions, usually reciting the same incident(s) each time. The BZA considered those allegations before making each decision on the permit applications. Therefore, each decision to grant a permit amounted to a finding either that the allegations were not true, or that if they were true, they were not sufficiently grave to justify a denial.

The BZA granted Ms. Coleman a new permit in 2007 after Mr. Demonbreun's 2006 permit expired. She intended to put the property to the same use as had Mr. Demonbreun. Both Mr. Demonbreun's and Ms. Coleman's permits were for a same Historic Home Events business in the Timothy Demonbreun House; both permits were subject to the same requirements for issuance and the same conditions. Thus, the most recent renewal for the use at the location was in 2007. The most recent renewal issuance to Mr. Demonbreun was in 2006.

Nonetheless, in the current application proceeding, Mr. Demonbreun was called upon to address again incidents that occurred a number of years earlier and prior to other renewals by the BZA. Because of the generality of the BZA's statement of reasons for its denial, we must assume these incidents entered into its denial decision.

---

[17]We note that although some of Mr. Demonbreun's neighbors opposed the continued operation of his business, others were in favor of letting him continue operating or at least are not opposed, indicating they experienced no harmful effects. As this court has stated, however, "[w]hile a hearing where all interested parties are given the opportunity fully express their views is essential, it is not a function of the Board to conduct a referendum on public attitudes relative to the petition." *Sexton v. Anderson County,* 587 S.W.2d 663, 664 n.1 (Tenn. Ct. App. 1979).

The transcript of the BZA hearing shows that there was a great deal of discussion by members of the public, and responses by Mr. Demonbreun, about incidents that occurred in 2001 and 2002. The Board members addressed questions towards Mr. Demonbreun, most of which referenced his conduct during this much earlier time. There was some reference to a few alleged violations of the conditions placed on Mr. Demonbreun's 2006 permit, but most of the public comments and much of the Board's deliberations was a rehash of long-standing grievances and events that preceded 2006, or whose dates could not be ascertained from the transcript. Nothing in the record reveals an explanation or satisfactory basis for the BZA to have determined that those incidents justified denial of a permit five or six years after they occurred.

The trial court held that while there was proof that Mr. Demonbreun had indeed violated the conditions of his permit several times during the years that he operated his business, there was no evidence that those violations were frequent or flagrant. The BZA did not specify which violations it considered serious or a harm to the public health, safety, or welfare, leaving the trial court to make its own evaluation of the seriousness of any violations.

One BZA member expressed frustration that the BZA had to continue to hear allegations that Mr. Demonbreun had violated the conditions of the special exception permit; indeed the board heard the same allegations several times over the years, whether they were relevant to the specific application under consideration. Several board members expressed their frustration at the lack of an effective enforcement mechanism to ensure compliance with the restrictions on the special exceptions permits they grant.[18] One BZA member criticized Mr. Demonbreun for appealing the conditions placed on an earlier permit, stating that, "You have no respect for the decisions of this Board because you simply appeal our decisions."

The trial court also found that the BZA's decision resulted from the dislike the board members felt towards Mr. Demonbreun, which was caused in large part from the frequency of his appearances before them, neighborhood opposition, and his readiness to appeal any decisions they made. Again, the BZA's failure to make specific findings regarding the violations they considered serious enough to justify denial and the effect on public health, safety and welfare left the trial court to review the entire record to discern for itself the reason for denial.

---

[18]The record shows that the BZA has also dealt with purported violations of the restrictions on Mr. Demonbreun's permit through "show cause" hearings, which are initiated by the citizen complaints. Some of those complaints have been dismissed as baseless, such as one objecting to the use of a volleyball net on property adjoining Mr. Demonbreun's.

Based on all of the above, we conclude that the BZA's denial of the application for a special exception permit was properly reversed by the trial court. While the BZA may take into consideration activities or conduct at the location, nothing in the record before us demonstrates that the decision to deny the permit herein was based upon the application of appropriate standards to the facts presented. Whether couched as unsupported by material and substantial evidence in the record, based on something other than the relevant evidence as applied to correct legal standards, or the result of misapplication of a legal standard, the BZA decision to deny the permit constitutes arbitrary action. *See Harding Academy v. the Metropolitan Government of Nashville and Davidson County,* 222 S.W.3d at 363.

In sum, we affirm the trial court's finding that the BZA acted arbitrarily in denying Mr. Demonbreun's application. We also affirm the reasoning that led the court to order the BZA to issue the requested permit rather than to simply remand the case to the zoning agency for its further decision. The court noted that while such remand is the most common judicial remedy in zoning cases, this case presented the sort of extraordinary circumstances that called for the broader exercise of the court's authority. *See Hoover v. Metro Board of Zoning Appeals*, 955 S.W.2d 52, 55 (Tenn. Ct. App. 1997).

## VII.

The judgment of the trial court is affirmed.[19] We remand this case to the Circuit Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Metropolitan Board of Zoning Appeals.

_____
PATRICIA J. COTTRELL, P.J., M.S.

---

[19]Mr. Demonbreun asks this court to reconsider some permit conditions, specifically, the duration. We note, however, that in the petition he presented to his neighbors for their signatures and subsequently presented to the Board, Mr. Demonbreun himself recited the eighteen-month limitation and other permit conditions. We accordingly do not believe he can be heard on appeal to object to a condition that he previously represented as appropriate.

-25-